801 So.2d 1131 (2001)
STATE of Louisiana
v.
Jimmy D. SPRINKLE.
No. 01-KA-137.
Court of Appeal of Louisiana, Fifth Circuit.
October 17, 2001.
*1133 Bruce G. Whittaker, Louisiana Appellate Project, New Orleans, LA, Attorney for Appellant Jimmy D. Sprinkle.
Jimmie D. Sprinkle, Angola, LA, Appellant Pro Se.
Paul D. Connick, Jr., District Attorney, State of Louisiana, Thomas J. Butler, Terry M. Boudreaux, Frank A. Brindisi, Assistant District Attorneys, Gretna, LA, Attorneys for Appellee State of Louisiana.
Panel composed of Judges EDWARD A. DUFRESNE, Jr., JAMES L. CANNELLA and THOMAS F. DALEY.
CANNELLA, Judge.
Defendant, Jimmy D. Sprinkle (Sprinkle), appeals from his conviction of second degree murder and his sentence to life imprisonment at hard labor, without benefit of parole, probation or suspension of sentence. For the reasons which follow, we affirm.
On June 4, 1999, Defendant was charged by indictment with the second degree murder of Charles Sarver, Sr. (Sarver, Sr.), a violation of La. R.S. 14:30.1. Defendant was arraigned on June 29, 1999 and pled not guilty. On February 23, 24 and 25, 2000, trial took place before a 12-person jury.
At trial, Deputy Frank J. Caracci of the Jefferson Parish Sheriffs Office (JPSO) testified that, on May 1, 1999 at approximately 11:00 a.m., he received a dispatch advising that there was a possible dead body at an apartment building at 3807 Airline Highway. When he arrived at the building, he was greeted at Apartment No. 9 by Glendon Nelson (Nelson), the Defendant's nephew and the owner of the building. Deputy Caracci observed that the deadbolt lock and door handle had been removed from the door of Apartment No. 9 and that the door was ajar. Deputy Caracci entered the apartment and saw Sarver, Sr. lying on the floor on his back in front of the couch. He saw a multi-colored robe wrapped around the victim's head. At that point, the East Jefferson General Hospital medical technicians arrived. Deputy Caracci thought that it was a homicide because he noticed signs of a physical struggle. He saw a coffee table in the couch area, a pool of red liquid which appeared to be blood splattered on the wall, a lamp overturned on the coffee table with what appeared to be hair fibers with the same red-colored matter attached to it, a couch with red colored smears and a cushion from the couch which had been removed from the couch area. Deputy Caracci and other officers conducted a search of the entire apartment for weapons. He did not see any weapons by the victim, in the victim's hand, underneath the victim or on the victim's person. He found a wrench on the floor behind the couch. Deputy Caracci did not see any knives in the apartment that day.
An investigator from the Coroner's Office arrived about one hour later. He removed the bathrobe from the victim's head, and Deputy Caracci observed the victim's beaten face, almost unrecognizable, with no eyeballs and a crushed skull. Deputy Caracci left the crime scene at approximately 3:30 p.m. When he left, a *1134 homicide officer, Detective Ralph Sacks of the JPSO, was still on the scene.
Detective Sacks corroborated the testimony of Deputy Caracci. Detective Sacks stated that he noticed injuries on the victim's arms, which appeared to be defensive wounds. He observed a red substance in the bathroom sink in the victim's apartment. He testified that the road officers searched the building and found a man named Ronnie James (James) in the Defendant's apartment. Nelson, stated that no one had permission to be in the apartment, so James was brought to the detective bureau for questioning. After James was questioned, he was ruled out as a suspect. Detective Sacks attempted to locate the Defendant because of the odd circumstances surrounding the incident. The Defendant apparently knew the victim, he had not returned to the scene, and there was someone in the Defendant's apartment. Detective Sacks obtained a search warrant for the Defendant's apartment and executed it on May 1, 1999. Detective Sacks seized six hammers, but none of them had any suspicious stains. He also seized some jeans and a shirt because he saw stains on the clothing. Detective Sacks did not find any knives. After Detective Sacks searched the Defendant's apartment, he searched the dumpster behind the building to ascertain whether anything pertinent to the case had been thrown into it. Detective Sacks seized some clothing and trash from the dumpster. He was unable to locate the Defendant on May 1, 1999.
The next day, the Defendant, along with the victim's son, Charles Sarver, Jr. (Sarver, Jr.), were stopped by road personnel. Both men were brought to the detective bureau for questioning. The Defendant completed and signed a waiver of rights form before giving a statement. The audio statement was played for the jury and a transcript of the statement was provided to the jury as well.[1] Detective Sacks had some photographs taken of the Defendant and noticed that he had an old injury on the back of his right hand, an old sore on his arm, some red stains on his T-shirt, and some stains on his pants. Detective Sacks obtained a search warrant for the Defendant's person in order to draw blood to ascertain whether the blood on the clothing belonged to him. After Detective Sacks got the search warrant signed, he went back to talk to the Defendant who gave a second statement where he admitted killing Sarver, Sr. in self-defense. The audio statement was played in court for the jury and a transcript of the statement was provided to the jury as well.[2]
On May 3, 1999, after the Defendant gave his second statement, Detective Sacks returned to the victim's apartment to look for the monkey wrench or hammer with which the Defendant hit the victim and the knife which the victim used to threaten the Defendant. Although the Defendant said that there had been tools *1135 scattered all over the victim's apartment, Detective Sacks said that was not true. He found a wrench in a red tool box behind the sofa. He also discovered a wrench under the table with red stains on it. Detective Sacks, two other detectives and serologists thoroughly searched the apartment for a knife. No knife that might have been used by the victim to threaten the Defendant was found.
Dr. Fraiser MacKenzie, a forensic pathologist with the Jefferson Parish Coroner's Office, testified that he performed the autopsy on Sarver, Sr. and that the manner of death was homicide. Sarver, Sr. was 56 years old, five feet six inches tall, and weighed approximately 128 pounds. Dr. MacKenzie determined that Sarver, Sr. had in his system cocaine and benzodiazepine, which is like Valium. He noticed some superficial abrasions on Sarver, Sr.'s left forearm which he stated were defensive wounds. Dr. MacKenzie testified that those type of wounds are sustained when an individual is attempting to fend off an assailant who is attacking him. Sarver, Sr. also had a small nick near the heel of the right hand and a recent injury on his right elbow which might be a defensive wound.
Dr. MacKenzie stated that most of the wounds were about the head area. Specifically, Sarver, Sr. had a wound on the right side of the face in the jaw area, a fracture of the jaw underneath that wound, a wound on the left side of the face adjacent to the eye, a collapse of the left forehead area with the eye receding back into the head, a large gaping wound in the front of the head that tore through the scalp and the skull with the brain tissue protruding from a portion of the wound. Dr. Mac-Kenzie testified that probably one blow was delivered to the victim's right jaw area, one to two blows to the left jaw or temple area, one blow to the chin, and probably three blows to the top of the head. He stated that it took a fairly substantial force to break the jaw and to cause the eye socket and the area surrounding it to collapse. The wounds to the top of the head were fatal and the wound to the left side of the head with the collapse of the orbit may have been fatal.
He also stated that the blows were each individually forceful enough to incapacitate the victim. Dr. MacKenzie said that once the victim received one of those blows, he would not have been able to act in an aggressive manner. He stated that the victim was in a defensive posture when he sustained those wounds. On cross-examination, Dr. MacKenzie testified that there were no wounds to the back of the victim, that the victim could have been the aggressor, that he couldn't tell how much time elapsed between the wounds or which wounds were inflicted first, and that all of the wounds were pre-mortem.
Sarver, Jr., testified that he lived in Mississippi, that he last saw his father in 1986, that he was supposed to meet his father on May 1, 1999, and that he had told his father he would come to visit and help him get a job offshore. He spoke to his father on April 30, 1999, at approximately 7:00 p.m. for about 20 minutes. About 9:00 p.m. that same evening, Sarver, Jr. called the Defendant's number again and asked to speak to his father. Sarver, Sr. did not have a telephone. When Sarver, Jr. asked the Defendant to get his father, he refused and said that his father had taken the Defendant's keys and locked him inside of his apartment and that he couldn't get out.
The next day, Sarver, Jr. drove from Mississippi by himself and arrived in the Airline Highway area about 10:00 a.m. He called the Defendant and got directions to the apartment. About five minutes later, Sarver, Jr. pulled up to the apartment *1136 building and the Defendant was waiting outside for him. Sarver, Jr. asked the whereabouts of his father and the Defendant told him that his father wasn't there and that he may have taken a walk. Sarver, Jr. asked the Defendant if they could go look for his father, which they did. While riding around, they met two female friends of the Defendant's and spent the day and night with them. The next morning at about 7:00 a.m., when Sarver, Jr. awoke, one of the women informed him that she had read in the newspaper that somebody at the apartment building had been killed.
Sarver, Jr. suspected that it was his father who had been killed, so he left with the woman and went back over to the apartment building. When Sarver, Jr. told the Defendant that his father had possibly been killed, he did not look scared or frightened or surprised. The Defendant and Sarver, Jr. went to a store. The Defendant went into the store, came out with some cigarettes, and got into the car. Before Sarver, Jr. could start the car, a JPSO car pulled up behind them. The officers took Sarver, Jr. and the Defendant to the police station.
Dr. Peter J. Winsauer was qualified as an expert in the field of behavioral pharmacology and was called by the defense. Dr. Winsauer stated that the toxicology report in this case revealed that the victim had cocaine and benzodiazepine in his system. He stated that cocaine produces euphoria and can produce paranoia or delusions or psychotic breaks at very high doses. He also testified that cocaine causes a down-regulation of some pain pathways and a decreased sensitivity to pain. He said that following chronic use, irritability and volatility are often reported.
Nelson was called by the defense and testified that he had owned the building, where the homicide took place, for the past 13 years. Nelson stated that the Defendant lived in his apartment building, and that he had asked Nelson if he would rent an apartment to Sarver, Sr., which he did about one year before the homicide. Nelson testified that he had known the Defendant and Sarver, Sr. since he was a child. He continually got complaints from the other tenants in the building about the Defendant and Sarver, Sr., so Nelson decided to evict them from their apartments. The complaints centered around the constant traffic to and from their apartments. Nelson gave the Defendant and Sarver, Sr. until either April or May 1, 1999 to leave their apartments.
A few days before May 1, 1999, Nelson knocked on Sarver's Sr.'s door and asked him if he had found a place to live yet, and he replied, "no, not yet." At about 9:00 a.m. on May 1, 1999, Nelson went to Sarver, Sr.'s apartment to see if he had moved. The door was ajar and the doorknobs were missing. Nelson knocked loudly on the door, but Sarver, Sr. didn't answer. Nelson went to the Defendant's apartment, but he wasn't there. Nelson went back to Sarver, Sr.'s apartment and pushed the door open. The air conditioner and the television were on, so he hollered loudly and saw a light on in the closet. As Nelson headed toward the closet, he tripped over Sarver, Sr.'s body. He saw the doorknob parts on the desk and on the floor. Nelson hollered at Sarver, Sr. to get up, but he didn't move, and Nelson reached down to shake him, but he was stiff. Nelson left the apartment and went to speak to John, the barber, who came with Nelson back to Sarver, Sr.'s apartment. They both agreed that Sarver, Sr. was dead, so they left and Nelson called the police. Nelson testified that when he was cleaning out the apartment a couple of weeks later, he found a white Rubbermaid *1137 container with water and dishes in it on Sarver, Sr.'s desk and that he saw a steak knife about eight to ten inches long in the bottom of the container. Nelson stated that the desk and the container looked the same on that day as it did when he first saw it on the day that he discovered Sarver, Sr.'s body. Nelson threw the knife away while he was cleaning the apartment because he thought the police had already taken everything they wanted.
Nelson testified that he was familiar with Sarver, Sr.'s general reputation in the community. When Sarver, Sr. first moved into the building, he got along with everyone, but toward the end, he was very irritable and constantly had problems with other people. Nelson stated that the Defendant had called him on the night of April 29, 1999 and told him that Sarver, Sr. had thrown a pipe through his window, that he had called the police and was scared. Nelson said that the Defendant had asked him to come and get him, but that Nelson did not go. Nelson told the Defendant to lock his door and go to bed, since he didn't think there was any need to go over there that night. Nelson went into the Defendant's apartment several days later and observed a broken window and a five-foot pipe. Nelson had earlier told the Defendant that Sarver, Sr. had threatened to put the Defendant in Charity Hospital because Sarver, Sr. believed that it was his fault that Sarver, Sr. was being evicted. Sarver, Sr. made this threat within two or three days before his death.
Nelson further testified that on May 5, 1999 he called the police because the Defendant's apartment had been burglarized. Nelson reported that the Defendant's television and stereo were missing and that there was a knife on a lawn chair about four feet from the entrance. One of the tenants told Nelson that he had seen a person carrying the items out of the building and that he had seen that person before with Sarver, Sr. and the Defendant.
The defense called several witnesses to testify about Sarver, Sr.'s general reputation in the community. Michael Tillman (Tillman) testified that he had known Sarver, Sr. for a couple of years through the Defendant and the tattoo shop located on the first floor of the apartment building. Tillman stated that he was familiar with Sarver, Sr.'s general reputation, that Sarver, Sr. was a convict and that everyone was afraid of him because he had done so much time in jail. About a week before the homicide, Tillman told the Defendant that Sarver, Sr. had come after Tillman with a cleaver, had tried to kill him, and that Sarver, Sr. had told Tillman that he was going to kill the Defendant. Tillman invoked his Fifth Amendment rights on every question asked by the State on cross-examination.
Kirk Russell (Russell), who was called by the defense, testified that he had known Sarver, Sr. for a couple of weeks, that he was acquainted with the Defendant, and that he had known Tillman for about six months. Russell stated that he was watching television and heard a loud noise coming from Tillman's room on one occasion. He said that it was Sarver, Sr. yelling at and threatening Tillman and telling him, "if it was the old school, I'd have to hurt you." Russell stated that when he got to the room, Sarver, Sr. was coming out and Tillman was up against the wall with a pillow. Sarver, Sr. told Tillman that if his friends weren't there, he would have to hurt him. Russell got out of the way because he didn't know if Sarver, Sr. had any weapons on him. He stated that Sarver, Sr. used to walk around with knives.
Lisa Ebright (Ebright), who was called by the defense, testified that she had *1138 known Sarver, Sr. and the Defendant for a year and that she knew mutual friends of theirs slightly. She described an incident that had occurred about two months before Sarver, Sr.'s death. She was at the Defendant's apartment and Sarver, Sr. was there. He mentioned that he was going to try and swindle money from a man who was in his apartment. Ebright said that she wasn't going to let that happen, so she got up to walk to Sarver, Sr.'s apartment to warn the man. Sarver, Sr. punched her in the back of the head. The Defendant got up to defend Ebright and Sarver, Sr. went to grab a knife that was on the Defendant's table. Ebright said that the knife belonged to Sarver, Sr. because she had seen him with it before. Sarver, Sr. told her that he was going to cut her up into little pieces. Ebright testified that Sarver, Sr.'s behavior that night was "crazy" and that she was afraid of him. She said that the Defendant appeared to be afraid.
Lisa LeBlanc (LeBlanc), who was called by the defense, testified that she had been friends with the Defendant and Sarver, Sr. for about four or five years, and that she visited their apartments about three or four times a week. LeBlanc stated that Sarver, Sr. was a loner, quiet, stayed to himself when he wasn't using or under the influence of drugs, and known to be "schizo." LeBlanc testified that Sarver, Sr. told her that he was going to "beat the hell" out of the Defendant with a wrench. She heard Sarver, Sr. say that he was going to "strangle the hell" out of the Defendant with a belt that the Defendant had made. LeBlanc said that Sarver, Sr. had broken into the Defendant's apartment on more than one occasion, that Sarver, Sr. had started fights on several different occasions, and that the Defendant was afraid of Sarver, Sr.
Don Lucas (Lucas), who was called by the defense, testified that for the past 16 years, he owned a tattoo and bike shop at 3807 Airline Highway. Lucas stated that at about 9:30 p.m. on April 30, 1999 he saw the Defendant and Sarver, Sr. in the Defendant's apartment. Lucas stated that Sarver, Sr. wore a velcro mustache on that night and was trying to be incognito. He said that Sarver, Sr.'s eyes were "real blank" and "scary looking," and that Sarver, Sr. looked "spooky." Lucas testified that Sarver, Sr. was "bipolar," either very quiet or full of rage. He said that he saw the Defendant a couple of days before Sarver, Sr. was found dead and that the Defendant looked worried and afraid. However, on cross-examination, he admitted that the Defendant and Sarver, Sr. were sitting quietly together when he saw them on the night of the homicide. Lucas stated that he had never seen the two of them in a fight, nor had he ever seen Sarver, Sr. threaten the Defendant.
The Defendant testified that he had felony convictions for simple possession of drugs in 1963, simple burglary in 1971 and 1974, possession of a firearm by a convicted felon and possession of methamphetamine in 1979, and simple burglary in 1982 and 1987. The Defendant stated that Sarver, Sr. had gotten out of prison on a burglary conviction and had no place to go, so he moved in with the Defendant in either March or April of 1997. He said that he had known Sarver, Sr. for about 35 years. They had lived together for two and one-half months, then Sarver, Sr. got his own apartment in the complex. The Defendant never had any problems with Sarver, Sr. until April of 1999 when Sarver, Sr. started using drugs again.
The Defendant said that he knew that in the 1960's, Sarver, Sr. had shot a man named Kenny Roberts. The Defendant stated that Sarver, Sr. told him that he *1139 had killed a man during a knife fight once, but that he "got out of it" because it was self-defense. He testified that three days before April 30, 1999, Sarver, Sr. had struck him several times and that the incident was witnessed by a woman named Dana Seal. The Defendant claimed that Sarver, Sr. also threatened him a month before his death. He said that he never reported Sarver, Sr.'s threats and attacks to the police because there was a "code" among convicts to never call the police, and he didn't want to be considered a "snitch." The Defendant testified that he and Sarver, Sr. had several fights prior to April 30, 1999. Sarver, Sr. was angry at the Defendant because he allowed a former prison guard to stay at his apartment for a few days. The Defendant stated that he would become afraid when Sarver, Sr. threatened him.
On April 28, 1999, the Defendant went to sleep, but was awakened when a four or five-foot pipe came through his bedroom window. The Defendant jumped out of bed and saw Sarver, Sr. standing "down there", cursing him. The Defendant called the police and they came out that evening. He called Nelson that night and told him that he was scared of what Sarver, Sr. might do to him since he had called the police. The Defendant thought that if he got away for a few days, Sarver, Sr. might calm down. Tillman warned the Defendant that Sarver, Sr. had threatened to kill him and that Sarver, Sr. had chased him with a meat cleaver. Sarver, Sr. also told the Defendant about the incident with the meat cleaver. Nelson told the Defendant that Sarver, Sr. had threatened to send him (the Defendant) to Charity Hospital because Sarver, Sr. thought the Defendant had complained to Nelson about the traffic in and out of the apartment. The Defendant testified that he saw Sarver, Sr. hit Ebright in the back of her head, then grab and shove her. Ebright told Sarver, Sr. that she would "put him in jail," and Sarver, Sr. went "completely insane," picked up a knife and went after her. The Defendant tried to subdue Sarver, Sr. and told Ebright to leave. The Defendant said that Sarver, Sr.'s behavior was getting much worse, that Sarver, Sr. was on parole, had lost his job and wanted to stay with the Defendant for two or three days at a time. The Defendant testified that Sarver, Sr. had started stealing again.
The Defendant stated that on the night of April 30, 1999, Sarver, Sr. came over to use one of the Defendant's syringes to administer cocaine. The Defendant said that he owned syringes because he was an insulin-dependent diabetic. He saw Sarver, Sr. dissolve and administer a $20 rock of cocaine in his leg. Sarver, Sr. left the Defendant's apartment and came back numerous times. At some point, Sarver, Sr.'s son had called, so the Defendant went to Sarver, Sr.'s apartment to get him. The Defendant went over again to Sarver, Sr.'s apartment later that night because he thought that Sarver, Sr.'s frequent trips to the Defendant's apartment were peculiar. When the Defendant got there, Sarver, Sr. had all the door knobs and lock mechanisms lying on the floor, and he was squatting down and working with the locks, using a file and a hammer as an anvil. The Defendant mentioned something to him about having to move out of the apartment and asked Sarver, Sr. what he was doing, and Sarver, Sr. "flipped" on him, going from "Jekyll to Hyde."
The Defendant testified that when Sarver, Sr. stood up, he had a kitchen knife with a serrated edge in his hand. The Defendant denied that State's exhibit 42, the knife found as a result of the burglary of his apartment 5 days after the homicide, was the knife with which Sarver, Sr. had threatened him. The Defendant said that he reached on the back of the sofa, picked *1140 up the hammer that Sarver, Sr. had been using to fix the locks, and then backed up. Sarver, Sr. started coming at the Defendant, cursing at him and calling him a snitch. The Defendant realized then that he was in serious danger. Sarver, Sr. lunged at him with the knife, and the Defendant hit him thinking he would go down, but he didn't. That scared the Defendant, so he continued hitting Sarver, Sr. about four more times. The Defendant testified that he couldn't run out of the apartment because Sarver, Sr. was between him and the door. The Defendant said that he kept hitting Sarver, Sr. because Sarver, Sr. acted like he wasn't hurt and never went down. After the Defendant hit Sarver, Sr. a few times, Sarver, Sr. fell and hit the wall. The Defendant saw that he was seriously injured, so he picked him up, laid him down, and wrapped his head. He stated that he couldn't even look at Sarver, Sr. because he "looked terrible." The Defendant stated that he felt very badly about what had happened, that he had known Sarver, Sr. all of his life, and that Sarver, Sr. had been like a brother to him years before.
The Defendant testified that he was scared and thought he might have to go back to prison, so he didn't call the police. He said that he was not thinking about self-defense at the time. He took the hammer into the bathroom, washed it off, wiped it with a paper towel and took it with him. The Defendant testified that when Sarver, Sr. fell, the knife fell on the floor. The Defendant stated that he picked up the knife and put it in the dishpan. He testified that he shouldn't have moved anything and that he wasn't thinking clearly. The Defendant then went back to his own apartment, where he stayed the rest of the night. The next morning, the Defendant steered Sarver, Jr. away from the apartment because he didn't want him to find his father "like that." The Defendant stated that he was still not thinking about self-defense. On cross-examination, the Defendant admitted that he did not give his second statement and start thinking about self-defense until after the detectives took his jeans, his shirt, the scrapings from underneath his fingernails and obtained a search warrant for his house. He did not tell James, the guest in the apartment, that Sarver, Sr. had tried to kill him and that he had to kill Sarver, Sr. in self defense.
The State called Deputy Kurt Zeagler in rebuttal. Deputy Zeagler testified that he responded to a call from the Defendant regarding criminal damage to property on April 29, 1999. When Deputy Zeagler entered the Defendant's apartment, he saw a broken window in the bedroom and a four to five foot pipe laying on the floor. The Defendant did not tell him who he thought had thrown the pipe through the window nor that when he looked out the window after the incident that he saw Sarver, Sr. Deputy Zeagler spoke to Sarver, Sr. in the hallway, but Sarver, Sr. said he had not heard or seen anything.
The jury found the Defendant guilty as charged. On March 13, 2000, the trial judge denied the Defendant's motions for a new trial and post verdict judgment of acquittal. The Defendant waived sentencing delays and was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. It is from this conviction and sentence that the Defendant appeals.
On appeal the Defendant assigns four errors, two counseled and two pro se. The Defendant has raised issues regarding sufficiency of the evidence, erroneous admission of evidence at trial and ineffective assistance of counsel. When the issues on appeal relate to both the sufficiency of the evidence and one or more *1141 trial errors, such as the erroneous admission of evidence, the reviewing court should first determine the sufficiency of the evidence by considering all of the evidence, including evidence the trial court may have erroneously admitted. State v. Hearold, 603 So.2d 731, 734 (La.1992); State v. Mayeux, 94-105 (La.App. 5th Cir.6/28/94), 639 So.2d 828, 834. If the appellate court determines that the evidence was insufficient, then the Defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary. However, if the appellate court finds that the totality of the evidence was sufficient to support the Defendant's conviction, it must then determine whether the trial court erred in admitting the questioned evidence and, if so, whether the trial court's error requires a reversal of the conviction or was harmless. State v. Alexis, 98-1145 (La.App. 5th Cir.6/1/99), 738 So.2d 57, 64, writ denied, 99-1937 (La.10/13/00), 770 So.2d 339. Therefore, we will consider the assigned error concerning the sufficiency of the evidence first, even though it was assigned second.

ASSIGNMENT OF ERROR NUMBER TWO
By this assignment of error the Defendant argues that the evidence was insufficient to support the verdict in that the State failed to prove, beyond a reasonable doubt, that the killing was not in self-defense.
The standard for reviewing the sufficiency of evidence was set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and adopted by Louisiana in State v. Abercrombie, 375 So.2d 1170, 1177-1178 (La.1979), cert. denied, Abercrombie v. Louisiana, 446 U.S. 935, 100 S.Ct. 2151, 64 L.Ed.2d 787 (1980). In Jackson, the court held that due process requires the reviewing court to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319, 99 S.Ct. at 2789 (emphasis in original).
Here, the Defendant was convicted of second degree murder, a violation of La. R.S. 14:30.1, which provides as follows:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm.
The Defendant claims that the homicide was justifiable because it was committed in self-defense which is defined in La. R.S. 14:20 as follows:
A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
When a defendant claims self-defense, the State must prove, beyond a reasonable doubt, that the defendant did not act in self-defense. State v. Garcia, 483 So.2d 953, 956 (La.1986); State v. Rader, 609 So.2d 857, 861 (La.App. 5th Cir. 1992). The relevant inquiry on appeal is whether a rational fact finder, after viewing the evidence in the light most favorable to the prosecution, could have found, beyond a reasonable doubt, that the homicide was not committed in self-defense. State v. Rader, 609 So.2d at 861; State v. Garcia, 483 So.2d at 956. The determination of a defendant's culpability focuses on a two-fold inquiry. First, from the facts presented, could the defendant reasonably have believed his life to be in imminent danger? Second, was deadly force necessary to prevent the danger? State v. T.N., *1142 94-669 (La.App. 5th Cir.1/18/95), 650 So.2d 288, 289-290. While there is no unqualified duty to retreat from an altercation, the possibility of escape is a recognized factor in determining whether or not a defendant had a reasonable belief that deadly force was necessary to avoid the danger. Id.
Here, the Defendant testified that when he went over to the victim's apartment on the night of April 30, 1999, Sarver, Sr. was squatting down and working with door knobs and lock mechanisms. The Defendant said that he mentioned something to Sarver, Sr. about having to move out of the apartment, and that Sarver, Sr. got angry, stood up and came at him with a knife. The Defendant testified that he picked up a hammer on the back of the sofa and then backed up. Sarver, Sr. allegedly lunged at him with the knife and the Defendant hit him with the hammer. When Sarver, Sr. did not fall down, the Defendant stated that he kept hitting him about four more times. The Defendant testified that he could not run out of the apartment because Sarver, Sr. was between him and the door. He admitted that he didn't call the police because he was afraid.
The Defendant stated that he wrapped Sarver, Sr.'s head with a bathrobe, took the hammer into the bathroom, cleaned it off and took it with him. He said that he lied to Detective Sacks when he told him that he had left the hammer in the apartment. The Defendant testified that he put the knife in a dishpan on Sarver, Sr.'s desk. The Defendant claimed that he steered Sarver, Jr. away from the apartment the next day because he didn't want him to find his father.
The Defendant said that he lied in his first statement when he told the police that he had nothing to do with the homicide. He also admitted that he did not give his second statement nor start thinking about self-defense until after the detectives took his jeans, shirt and scrapings from underneath his fingernails, and obtained a search warrant for his house. During his testimony, the Defendant stated that he was afraid of Sarver, Sr. because he had threatened him and struck him in the past. LeBlanc, Ebright, Tillman, Russell, and Nelson testified that Sarver, Sr. had threatened the Defendant and attacked others in the past.
The State presented the testimony of Dr. MacKenzie that the victim had defensive wounds on his left arm and two wounds on his right arm which could be defensive wounds. Dr. MacKenzie stated that probably five to six blows of substantial force were delivered to the victim's head and that the blows were each individually forceful enough to incapacitate the victim. Dr. MacKenzie testified that once the victim received one of these blows, he would not have been able to act in an aggressive manner. He also stated that the victim was in a defensive posture when he sustained those wounds.
The Defendant claims that he killed Sarver, Sr. in self-defense. However, we find that the evidence supports the jury's verdict of second degree murder. The Defendant hid evidence, failed to tell anyone about the events that had transpired, and initially lied to detectives about his involvement in the homicide. Detective Sacks, in his search of the victim's apartment, did not find a knife that Sarver, Sr. allegedly used to threaten the Defendant. Further, there was evidence presented that the Defendant did not believe that his life was in imminent danger and that deadly force was not necessary to prevent the danger.
Based on the foregoing, a rational trier of fact could have found, beyond a reasonable doubt, that the homicide was not committed *1143 in self-defense, and therefore, that the Defendant was guilty beyond a reasonable doubt. Thus, the Defendant is not entitled to an acquittal. This assignment of error lacks merit. Having made this determination, the next consideration is whether the trial court erred by admitting evidence erroneously.

ASSIGNMENT OF ERROR NUMBER ONE
By this assignment of error the Defendant through defense counsel argues that the trial court erred in denying the motion for a mistrial based upon the State's deliberate elicitation of a reference to another crime alleged to have been committed by the Defendant.
More particularly, on the second day of trial, February 24, 2000, defense counsel told the judge that the State, that morning, had given to him a police report pertaining to a burglary in the Defendant's apartment which occurred on May 5, 1999, five days after the homicide. Defense counsel argued that the police report should be excluded because it was provided to him at the last minute in violation of the rules of discovery. Defense counsel contended that the police report, all testimony related to the burglary and the finding of the knife, or intimations that the Defendant may have planted the knife to support his theory of self-defense should be excluded because it was other crimes evidence, and the State failed to comply with the procedural requirements of written notice and a pre-trial hearing required by State v. Prieur, 277 So.2d 126 (La.1973) and La. C.E. art. 404 B. Defense counsel also argued that evidence from the burglary had no probative value in relation to the second degree murder charge and that the prejudicial effect of the evidence outweighed the probative value under La. C.E. art. 403.
The State argued that evidence obtained from the burglary, including the knife, was admissible other crimes evidence because it was part of the homicide investigation, and that the knife should be admissible because, months before trial, the State had provided defense counsel with a photograph of the knife. Defense counsel argued that the item number from the homicide and not the burglary was on the back of the photograph of the knife and, therefore, he didn't know that the State intended to introduce the knife or the evidence regarding the burglary. Defense counsel claimed that he did not know until the State's opening argument that it was going to prove that the Defendant had planted the knife. The State countered by arguing that defense counsel should have anticipated that it may prove that the Defendant had planted the knife.
Deputy Sal Labue of the JPSO testified for the State that, on May 5, 1999 at 4:00 p.m., he responded to a call regarding a residential burglary at 3807 Airline Highway. When Deputy Labue arrived at that location, Nelson directed him to Apartment No. 8, the Defendant's apartment, on the second floor. Deputy Labue walked into the apartment and saw a green lawn chair about four feet from the door with a serrated kitchen knife lying on top of it.[3] Nelson told Deputy Labue that the deadbolt had been engaged and entrance require using a key. Deputy Labue noted that a television, stereo and cable box were missing from the apartment. On cross-examination, Deputy Labue stated that the Defendant was ruled out as a suspect because, at the time of the burglary, he was in the Jefferson Parish Correctional Center *1144 (JPCC). On redirect, the State asked if there were telephones in the JPCC. Defense counsel objected and moved for a mistrial. The court overruled the objection and denied the motion for a mistrial. The State again asked Deputy Labue whether there were telephones in the JPCC and he responded affirmatively.
Generally, evidence of other crimes or bad acts committed by a defendant in a criminal case is inadmissible at trial unless the probative value of the evidence substantially outweighs its unfair prejudicial effect, and unless it falls under one of the statutory or jurisprudential exceptions to the exclusionary rule. La. C.E. arts. 403 and 404; State v. Cangelosi, 98-589 (La. App. 5th Cir.11/25/98), 722 So.2d 1107, 1110.
The trial court is required to grant a mistrial, upon motion of the defendant, when a remark or comment about another inadmissible crime committed by the defendant is made by the judge, district attorney, or a court official. La.C.Cr.P. art. 770.
A police officer is not a court official under the mandatory mistrial provisions of La.C.Cr.P. art. 770. State v. Jackson, 00-191 (La.App. 5th Cir.7/25/00), 767 So.2d 833, 835-836 and the cases cited therein. However, an impermissible reference to another crime deliberately elicited by the prosecutor is imputable to the State and therefore triggers the rule mandating a mistrial. State v. Jones, 00-162 (La.App. 5th Cir.7/25/00), 767 So.2d 862, 866; State v. Hester, 99-426 (La.App. 5th Cir.9/28/99), 746 So.2d 95, 109, writ denied, 99-3217 (La.4/20/00), 760 So.2d 342.
Considering the foregoing, we find no error in the trial court's refusal to grant a mistrial. The question and response at issue made no specific mention of other crimes committed or alleged to have been committed by the Defendant. The prosecutor asked Deputy Labue whether there were telephones in the JPCC, and he said, "yes".
In State v. Rhodes, 95-54 (La. App. 5th Cir.6/28/95), 657 So.2d 1373, 1376-1377, writ denied, 95-2265 (La.3/14/97), 690 So.2d 28, this Court found that La.C.Cr.P. art. 770 is not applicable unless the inference clearly constitutes a comment on other crimes committed or alleged to have been committed by the Defendant. Further, it appears that the defense questioning of Deputy Labue on cross-examination regarding the Defendant's whereabouts at the time of the burglary opened the door for the State to ask Deputy Labue on redirect whether there were telephones in the JPCC.
Moreover, even if we found that the question and response were improperly admitted, it would be a harmless error. An improper reference to other crimes is subject to the harmless error analysis. State v. Simmons, 98-841 (La. App. 5th Cir.6/1/99), 738 So.2d 1131, 1136, writ denied, 99-2419 (La.4/20/00), 760 So.2d 333. An error is harmless when the guilty verdict actually rendered at trial was surely unattributable to the error. Id.
Considering the substantial amount of evidence at trial as a whole, we find that the guilty verdict was surely unattributable to the statement made by Deputy Labue that might have alluded to another crime allegedly committed by the Defendant.[4] At trial, Dr. MacKenzie testified that Sarver, Sr. was struck five or six times in the head area and that each blow was individually forceful enough to incapacitate him. Once Sarver, Sr. received *1145 one of those blows, he would not have been able to act in an aggressive manner. Dr. MacKenzie testified that Sarver, Sr. had defensive wounds on his arms indicating that he was defending himself from an attack. Detective Sacks testified that he did not find a knife in the apartment where Sarver, Sr. was killed.
Thus, we hold that the trial court did not err in denying the Defendant's request for a mistrial based on Deputy Labue's veiled reference to another crime allegedly committed by the Defendant. This assignment of error lacks merit.

SUPPLEMENTAL ASSIGNMENTS OF ERROR NUMBERS ONE AND TWO (PRO SE)
By these assignments of error the Defendant argues in his pro se brief that the evidence from the May 5th burglary, including the knife, should have been excluded because it was irrelevant and immaterial to the State's case-in-chief under La. C.E. arts. 401 and 402. He also argues that his counsel was ineffective because he did not object to the admission of the evidence on this ground and because he failed to request a limiting instruction be given to the jury regarding the improperly admitted evidence.
A defendant is entitled to effective assistance of counsel under the Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution of 1974. In assessing a claim of ineffectiveness, a two-pronged test is employed. The Defendant must show that (1) his attorney's performance was deficient, and (2) the deficiency prejudiced him. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Soler, 93-1042 (La.App. 5th Cir.4/26/94), 636 So.2d 1069, 1075, cert. denied, 94-1361 (La.11/4/94), 644 So.2d 1055. The error is prejudicial if it was so serious as to deprive the Defendant of a fair trial, or "a trial whose result is reliable." Strickland v. Washington, 466 U.S. at 687, 104 S.Ct. at 2064; State v. Serio, 94-131 (La.App. 5th Cir.6/30/94), 641 So.2d 604, 607, writ denied, 94-2025 (La.12/16/94), 648 So.2d 388. In order to show prejudice, the Defendant must demonstrate that, but for counsel's unprofessional conduct, the outcome of the trial would have been different. Strickland v. Washington, 466 U.S. at 694, 104 S.Ct. at 2068; State v. Soler, 636 So.2d at 1075.
A claim of ineffective assistance of counsel is most appropriately addressed through an application for post-conviction relief rather than direct appeal, so as to afford the parties an adequate record for review. State v. Truitt, 500 So.2d 355, 359 (La.1987); State v. McIntyre, 97-876 (La. App. 5th Cir.1/27/98), 708 So.2d 1071, 1075, writ denied, 98-1032 (La.9/18/98), 724 So.2d 753. Only when the record contains sufficient evidence to decide the issue and the issue is properly raised by assignment of error on appeal may it be addressed in the interest of judicial economy. State v. Peart, 621 So.2d 780, 787 (La.1993); State v. McIntyre, 708 So.2d at 1075. The appellate record in this case contains sufficient evidence for our consideration of this claim of ineffective assistance of counsel.
The Defendant argues that the evidence found as a result of the burglary should have been excluded because it was irrelevant and immaterial under LA. C.E. arts. 401 and 402. However, a review of the record reveals that the evidence was relevant and admissible. The Defendant claimed that he had to kill Sarver, Sr. in self-defense because Sarver, Sr. had threatened him with a knife. However, during the investigation of the homicide on May 1, 1999, no knife was found to support the Defendant's theory of self-defense either in the Defendant's or in the victim's apartments. Therefore, the appearance of a knife on a chair in the Defendant's apartment five days after the homicide, a chair *1146 that was outside of the Defendant's apartment on May 1, 1999, was relevant evidence and therefore admissible.
Although the Defendant claims that he was prejudiced by the introduction of the knife found as a result of the burglary, he was not unfairly prejudiced because both the State and the defense had the opportunity to argue their respective positions to the jury. The State suggested during opening statement and in redirect examination of Deputy Labue that the burglary and the planting of the knife were orchestrated by the Defendant to support his theory of self-defense. The State argued in its closing argument that Sarver, Sr. did not threaten the Defendant with a knife and that was the reason no knife was found during the investigation on May 1, 1999. The Defendant testified during direct examination that the knife, found as a result of the burglary, was not the knife which Sarver, Sr. used to threaten him. The defense argued during closing argument that the knife found as a result of the burglary was irrelevant to the homicide. Based on the foregoing, the Defendant's argument that his trial counsel was ineffective for not objecting to the evidence as irrelevant and immaterial is without merit.
Moreover, a review of the record indicates that the Defendant's trial counsel raised adequate objection to the admission of the evidence. Trial counsel not only objected to evidence from the burglary as being inadmissible other crimes evidence, he also objected to the evidence as not being probative of the charged offense, a fact which the Defendant in his pro se brief fails to acknowledge. While it is true that trial counsel did not object expressly to the irrelevancy and immateriality of the burglary and the knife, arguably because he knew the evidence was relevant and material, his objection amounted to the same thing. Also, he made the most important objection, that the admission of the knife was highly prejudicial and that any probative value of the knife was outweighed by the prejudice that the Defendant would suffer by the introduction of the knife and any testimony related to it under La. C.E. art. 403. As such, the Defendant's argument that his trial counsel was ineffective is without merit. These assignments of error lack merit.

PATENT ERROR
Assigned as error are any and all errors patent.
The record was reviewed for errors patent, according to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5th Cir.1990). The review reveals no errors patent on the face of the record in this case.
For the foregoing reasons, we affirm the Defendant's conviction for second degree murder and his sentence to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence.
AFFIRMED.
NOTES
[1] In his first statement, the Defendant stated that he last saw Sarver, Sr. at 10:00 p.m. on Friday, April 30, 1999 and that he never saw him again after that. He said that he didn't do anything to Sarver, Sr. When asked if he had any idea what had happened to him, the Defendant stated, "not really, not really."
[2] In his second statement, the Defendant stated that during the evening of April 30, 1999, Sarver, Sr. invited him to his apartment. During an altercation, Sarver, Sr. came after him with a knife. The Defendant said that he picked up a tool, maybe a monkey wrench or hammer, and hit Sarver, Sr. on his head four or five times because Sarver, Sr. kept coming at him. He said that he then washed off the tool and left it on the floor of Sarver, Sr.'s apartment. Numerous times the Defendant stated that he was scared of Sarver, Sr., that Sarver, Sr. had killed people before, and had threatened him several times.
[3] Detective Sacks testified that neither the knife nor the chair were present when he searched the apartment on May 1, 1999. Detective Sacks stated that the chair was outside the apartment on the day that he was there.
[4] See discussion under Assignment of Error Number Two regarding sufficiency of the evidence.