866 So.2d 995 (2004)
STATE of Louisiana
v.
Albert WOODHEAD.
No. 03-KA-1036.
Court of Appeal of Louisiana, Fifth Circuit.
January 27, 2004.
*997 Paul D. Connick, Jr., District Attorney, Andrea F. Long, Terry M. Boudreaux, Frank A. Brindisi, Vincent Paciera, Jr., Assistant District Attorneys, Gretna, LA, for Appellee.
Bruce G. Whittaker, New Orleans, LA, for Appellant.
Panel composed of Judges SOL GOTHARD, THOMAS F. DALEY and MARION F. EDWARDS.
MARION F. EDWARDS, Judge.
Defendant, Albert Woodhead, appeals his conviction for second degree murder. For the following reasons, defendant's conviction is affirmed.
On June 8, 2000, a Jefferson Parish Grand Jury returned an indictment against the defendant, Albert Woodhead, for the second degree murder of Earl Raines, in violation of LSA-R.S. 14:30.1. At arraignment, Woodhead pled not guilty, but subsequently moved for a psychological evaluation. He changed his plea to not guilty and not guilty by reason of insanity on September 7, 2000.
On June 8, 2001, Woodhead filed a motion to introduce evidence of Raines's dangerous character, which the trial judge denied. On March 25, 2003, the trial judge granted the State's motion to exclude evidence of cocaine found in Raines's body, and the defendant proceeded to trial that day. However, Woodhead applied for supervisory review to this Court, which granted the writ application. Thereafter, the judge granted Woodhead's motion for a mistrial.
On April 9, 2003, a jury of twelve persons was empaneled, and found Woodhead guilty as charged on April 11, 2003. Woodhead subsequently filed a motion for new trial, which the trial court denied. After Woodhead waived sentencing delays, the trial court sentenced him to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence on May 1, 2003. Woodhead timely filed the present appeal.
At 7:30 a.m. on April 13, 2000, the Jefferson Parish Sheriff's Office received a telephone call from someone who reported that there was a body near Lake Pontchartrain between North Arnoult and the levee in Metairie. Sergeant Thornton, Lieutenant English, and Detective Klein went to the area. They discovered the body of a man, subsequently identified as Earl Raines, partially covered by a blue shower curtain. The victim had sustained several facial wounds, and the officers suspected a homicide. Forensic pathologist Susan Garcia described the facial wounds as four areas of blunt force trauma with one definitive lethal wound. That wound extended 4¾ inches across the victim's forehead through which bone was visible. There was another laceration below the victim's chin that Dr. Garcia said could have been lethal. The victim also sustained six sharp force non-lethal wounds to his neck, as well as a bruise to the base of his neck. Additionally, the victim's blood alcohol level was .29 and the presence of cocaine was detected in his body. According to Dr. Garcia, the victim had no typical defensive injuries, such as to the hands and forearms. The victim had abrasions on his elbows and left arm that Dr. Garcia opined could be considered defensive injuries.
*998 Later that day, a friend of Raines's, Samuel Buchanan, called the police to let them know that Raines was last seen in Woodhead's apartment in the early morning hours of April 13, 2000. Buchanan testified on behalf of the defense that he and Raines started bar hopping on April 12, 2000 at 10:00 in the morning. At some point during the day, Raines telephoned a woman named Sherree Merrett to pick him up. Raines and Buchanan met up later in the day and were together until early the next morning. According to Buchanan, Raines was asked to leave the last bar they visited because the bartender believed he was too intoxicated. Buchanan and Raines walked past Buchanan's apartment, where Buchanan offered to allow Raines to spend the night. However, Raines declined. When they passed Raines's sister's house, Buchanan asked Raines if he wanted to stay there, but he said that he would show Buchanan where he wanted to stay. They walked around the corner to the apartment of the defendant, whom Buchanan had never met. Woodhead said that Raines could stay the night, and Raines asked Buchanan to get him some cigarettes. Buchanan complied, and returned with the cigarettes, which he gave to Woodhead. Buchanan asked Woodhead if everything was okay, and Woodhead replied affirmatively.
On April 14, 2000 at 12:10 a.m., the police executed a search warrant at Woodhead's apartment. Woodhead was not inside his apartment at the time, but was in the courtyard of the complex. Sergeant Thornton and Detective Klein apprised Woodhead of the investigation and told him that his apartment was being searched pursuant to a warrant. After Sergeant Thornton advised Woodhead of his Miranda rights, he and Detective Klein transported Woodhead to the criminal investigations bureau.
At the investigations bureau, Woodhead initially told Detective Klein and Sergeant Thornton that Raines had spent the night, but was gone in the morning when he awakened. Upon further questioning, Woodhead gave a tape recorded, transcribed statement in which he claimed to have killed Raines in self-defense. According to Woodhead, he had known Raines for two weeks, and Raines had been to his apartment three times. Woodhead said that Raines vomited shortly after arriving at the apartment at 2:30 a.m., and that he, himself, cleaned it up. Thereafter, Raines fell asleep on Woodhead's floor at the foot of the bed in the Woodhead's studio apartment. At approximately 4:00 a.m., Woodhead heard Raines cursing, then saw Raines go into the kitchen and return with a knife. Raines allegedly charged at Woodhead with the knife, and Woodhead grabbed his baseball bat from under his bed. Woodhead struck Raines in the throat with the bat and knocked him back. Raines lunged again with the knife, and Woodhead hit him in the forehead. Raines staggered, but swung the knife again, and the Woodhead hit him in the forehead or his nose. At that point, Raines fell to the ground, but Woodhead struck him "a couple" more times to make sure he did not get back up.
Raines was bleeding profusely and Woodhead did not believe he was breathing. Woodhead said he panicked because of what had happened. He then decided to get the body out of the house. Woodhead dragged Raines's body to his pickup truck, dumped it by the levee, and covered it with a shower curtain. When Woodhead returned, he cleaned the apartment and washed the knife. Woodhead said that the knife must have fallen underneath Raines when he went to the ground. Woodhead said he did not know what had provoked Raines.
*999 At trial, Woodhead reiterated most of his statement; however, he added that he had wrapped his left forearm in a T-shirt to protect himself during the altercation. Further, Woodhead testified that he blocked the first swing of the knife with his left arm while swinging the bat in his right hand. Woodhead claimed he "blacked out" after striking Raines repeatedly. He acknowledged that it would be reasonable to infer, however, that he had inflicted the six wounds to Raines's neck. Woodhead acknowledged that he had sustained no injuries during the struggle.
The search of Woodhead's apartment revealed blood in many places, including the furniture, the television, the walls, the ceiling, and the carpet. The police also found the baseball bat and the victim's shoes in the defendant's truck. According to Lieutenant English, there was no obvious sign of a struggle in the defendant's apartment.
In addition to Samuel Buchanan and Woodhead's testimony, the defense also presented the testimony of Dr. Gary McGarrity, an expert pharmacologist. According to Dr. McGarrity, the level of cocaine in the decedent's body indicated that he had used cocaine within twelve hours of his death. Dr. McGarrity opined that the decedent would have "more of a propensity for violence" due to the presence of alcohol and cocaine in his body.
Woodhead contends that the evidence presented at trial was insufficient to support his conviction for second degree murder because the State failed to prove beyond a reasonable doubt that he did not act in self defense. The State responds that the evidence supports the jury's decision to reject the self-defense theory.
When, as in this case, issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the appellate court first determines the sufficiency of the evidence.[1] In reviewing the sufficiency of evidence, this Court must determine whether, viewing the evidence, direct and circumstantial, in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt.[2]
The defendant was convicted of second degree murder, which is defined in LSA-R.S. 14:30.1(A)(1) as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. Specific intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act."[3] Specific intent need not be proven as a fact but may be inferred from the circumstances and actions of the accused.[4] Specific intent to kill or inflict great bodily harm may be inferred from the extent of the victim's injuries.[5]
Woodhead contends that the evidence supported a finding that the homicide was justified because he acted in self-defense. According to LSA-R.S. 14:20, a *1000 homicide is justifiable "[w]hen committed in self-defense by one who reasonably believes that he is imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." When a defendant claims self-defense, the State must prove, beyond a reasonable doubt, that the defendant did not act in self-defense.[6] The determination of a defendant's culpability focuses on a two-fold inquiry. First, from the facts presented, could the defendant reasonably have believed his life to be in imminent danger, and; second, was deadly force necessary to prevent the danger?[7] While there is no unqualified duty to retreat from an altercation, the possibility of escape is a recognized factor in determining whether or not a defendant had a reasonable belief that deadly force was necessary to avoid the danger.[8]
In the present case, it appears that the evidence established beyond a reasonable doubt that the defendant did not kill in self-defense. Dr. Garcia testified that the decedent sustained four blunt trauma wounds to the face. Regarding the lethal 4¾ inch injury, Dr. Garcia said that Raines would have been incapable of "purposeful movement" after the blow that inflicted this wound. This blow shattered the forehead and drove bone fragments into Raines's brain. According to Dr. Garcia, such a blow would have required "significant force" to inflict. Further, Dr. Garcia stated that the blow to the decedent's chin would have rendered him unconscious. Although Woodhead described two of the blows he inflicted as "little taps," the autopsy photographs demonstrate the severity of the victim's injuries.
Additionally, the wounds to Raines's neck are not consistent with the defendant's self-defense theory. Dr. Garcia testified that the wounds could not have been inflicted by Raines or sustained from Raines falling on the knife. Further, Dr. Garcia stated there were six separate injuries that could not have been made by a single motion. Three of the wounds were consistent with stab wounds and three of them were consistent with linear cuts. At trial, Woodhead acknowledged that it would be reasonable to infer that he inflicted these wounds, although he did not recall doing so.
While Woodhead claims he was not the aggressor, he sustained no injuries in the fray. While Woodhead testified that he wrapped his left arm in a T-Shirt, he never told that to the police. Woodhead never called the police to report that he had killed Raines in self-defense, nor did he preserve the knife that he claims Raines wielded. Rather, Woodhead washed the knife, destroying any evidence that Raines had held the knife as defendant claimed. He covered up his actions, disposed of the body, and he lied in his first statement when he denied any knowledge of Raines's death. Further, there is no evidence that Woodhead attempted to retreat from the altercation.
In State v. Sprinkle,[9] this Court held that the evidence was legally sufficient to prove that the defendant did not act in self-defense, noting that the defendant hid *1001 evidence, failed to tell anyone about the altercation in which the victim allegedly lunged at him with a knife, and lied to the police about his involvement in the victim's death.
As in Sprinkle, we find that a rational fact finder, after viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that the homicide was not committed in self-defense. Accordingly, we find this assignment to be without merit.
Woodhead next contends that the trial court erred in ruling that there was no "appreciable evidence" of an overt act or hostile demonstration on the part of the victim in this case, thus prohibiting the introduction of evidence regarding the character of the victim. According to Woodhead, his version of the events was sufficient to warrant introduction of Raines's violent character.
The record shows that Woodhead filed a pretrial motion and memorandum to introduce evidence of the decedent's dangerous character through
police reports; arrest records or "rap sheets"; memoranda; and notes or documents of any nature of any kind, as well as witnesses of prior assaults committed by the decedent and which relate to or in any way reflect or report prior criminal acts and dangerous character of the decedent and further reflect any propensity of the decedent towards violence.
Additionally, the motion alleged that "an acquaintance" had told Woodhead that the decedent "was of a dangerous character, especially when he was intoxicated or drugged up on cocaine." After considering memoranda from the State and the defendant, the trial court denied the motion with written reasons. This Court and the Louisiana Supreme Court denied Woodhead's writ applications.
The State responds that these pretrial determinations were correct because the defendant's statement, uncorroborated by other evidence, does not meet the legal standard to justify introduction of the victim's character. In its brief, the State acknowledges that pretrial rulings of reviewing courts are not dispositive, but urges this Court to uphold its ruling. In denying the defendant's writ application, this Court ruled:
WRIT DENIED
Evidence of the victim's dangerous character, prior threats against the accused or prior bad acts is admissible at the trial of the accused only if there is "appreciable evidence" of a hostile demonstration or an overt act on the part of the victim at the time of the offense. LA.C.Cr.P. art. 404; State v. Edwards, 420 So.2d 663 (La.1982). We agree with the trial court's finding that the defendant's testimony, alone and without corroborating physical evidence, is insufficient to show that the victim made a hostile demonstration or overt act against him. Therefore, the trial court did not abuse its discretion by denying defendant's motion in limine. Accordingly, defendant's writ application is denied.[10]
The Louisiana Supreme Court has recognized that a ruling denying supervisory writs does not bar reconsidering the issue on appeal and reaching a different conclusion.[11] In State v. Wessinger, writs were *1002 denied by the appellate court and the Louisiana Supreme Court. On appeal, the Louisiana Supreme Court noted this rule, but addressed the issue on appeal and found that there was no reason to disturb the trial court's ruling.[12] As in Wessinger, we do not find that the trial court's ruling in the present case was in error.
Evidence of the decedent's dangerous character or of his threats against the defendant may be admissible in support of a plea of self-defense, provided that the defendant first produces evidence that the decedent had made a hostile demonstration or overt act against the accused at the time of the incident.[13] Such evidence supports a plea of self-defense because it is relevant to show that the victim was the aggressor and to show that the defendant's apprehension of danger was reasonable.[14]
LSA-C.E. art. 404 governs the admissibility of such evidence in pertinent part:
A. Character evidence generally. Evidence of a person's character or a trait of his character, such as a moral quality, is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
. . . .
(2) Character of victim. (a) Except as provided in Article 412, evidence of a pertinent trait of character, such as a moral quality, of the victim of the crime offered by an accused, or by the prosecution to rebut the character evidence; provided that in the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of his dangerous character is not admissible[.]...
. . . .
B. Other crimes, wrongs, or acts.
....
(2) In the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of the victim's prior threats against the accused or the accused's state of mind as to the victim's dangerous character is not admissible[.]...
An overt act within the meaning of article 404 is an act of the victim that manifests in the mind of a reasonable person a present intention on his part to kill or do great bodily harm.[15] Once the defense has introduced appreciable evidence of the overt act, "the trial court cannot exercise its discretion to infringe on the fact-determination function of the jury by disbelieving this defense testimony and thus, deny the accused a defense permitted him by law."[16]
In State v. Jones, supra, this Court found that the defendant's self-serving testimony, alone, was insufficient to carry his burden of showing that the victim made a hostile demonstration or committed an overt act against him. Likewise, State v. *1003 Martin[17] concluded there was insufficient appreciable evidence of an overt act or hostile demonstration where the defendant's testimony stood alone and it was generally in sharp conflict with other testimony and evidence.
In the present case, Woodhead relied on his statement and trial testimony to establish an overt act. However, none of the other evidence at trial corroborated his version of the events. Woodhead was not injured when he claimed to be fending off the assault by Raines. The police found no evidence of a struggle in the apartment, and Woodhead did not preserve the condition of the knife that he claimed the decedent used to attack him. Although blood was discovered in the serration of the knife, the quantity of blood was insufficient to determine its type and there were no fingerprints on the knife. In the reasons for judgment, the trial judge concluded that Woodhead's statements, standing alone, do not constitute appreciable evidence of an overt act or hostile demonstration to warrant introduction of evidence of the decedent's dangerous character. Based on the foregoing jurisprudence, we do not find the trial judge's ruling was in error.
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux,[18] and State v. Weiland.[19] The review reveals no errors patent in this case.
Accordingly, for the foregoing reasons, the defendant's conviction is affirmed.
AFFIRMED.
NOTES
[1] State v. Marcantel, 00-1629, p. 8 (La.4/3/02), 815 So.2d 50, 55, citing, State v. Hearold, 603 So.2d 731, 734 (La.1992).
[2] Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Mitchell, 99-3342, p. 6 (La.10/17/00), 772 So.2d 78, 82.
[3] LSA-R.S. 14:10(1).
[4] State v. Graham, 420 So.2d 1126, 1127 (La. 1982).
[5] State v. Daniels, 01-545, p. 8 (La.App. 5 Cir. 11/27/01), 803 So.2d 157, 162, writ denied, 02-215 (La.11/27/02), 831 So.2d 272.
[6] State v. Baldwin, 96-1660, p. 4 (La.12/12/97), 705 So.2d 1076, 1078, cert. denied, 525 U.S. 831, 119 S.Ct. 84, 142 L.Ed.2d 66, (1998); State v. Rader, 609 So.2d 857, 861 (La.App. 5 Cir.1992).
[7] State v. T.N., 94-669, p. 2 (La.App. 5 Cir. 1/18/95), 650 So.2d 288, 289-290.
[8] Id.
[9] 01-137, pp. 17-18 (La.App. 5 Cir. 10/17/01), 801 So.2d 1131, 1142-1143, writ denied, 01-3062 (La.10/25/02), 827 So.2d 1174, cert. denied, 537 U.S. 1235, 123 S.Ct. 1358, 155 L.Ed.2d 200 (2003),
[10] State v. Woodhead, 02-K-365 (La.App. 5 Cir. 5/7/02), unpublished, JJ McManus, Daley, Rothschild. The Louisiana Supreme Court denied writs in State v. Woodhead, 02-1378 (La.10/04/02), 826 So.2d 1122.
[11] State v. Wessinger, 98-1234 (La.5/28/99), 736 So.2d 162, 171, cert. denied, 528 U.S. 1050, 120 S.Ct. 589, 145 L.Ed.2d 489 (1999); State v. Fontenot, 550 So.2d 179 (La.1989).
[12] See also, State v. Jenkins, 558 So.2d 800, 801 (La.App. 5 Cir.1990), writ denied, 564 So.2d 321 (La.1990).
[13] State v. Lee, 331 So.2d 455, 458 (La.1975).
[14] State v. Edwards, 420 So.2d 663, 669 (La. 1982).
[15] State v. Jones, 99-798 (La.App. 5 Cir. 11/10/99), 748 So.2d 1176, writ denied, 00-306 (La.12/08/00), 775 So.2d 1076.
[16] State v. Lee, 331 So.2d at 459; Accord, State v. Schexnayder, 97-729 (La.App. 1 Cir. 4/8/98), 708 So.2d 851, 855, writ denied, 98-1665 (La.10/30/98), 723 So.2d 978.
[17] 562 So.2d 468, 470 (La.App. 5 Cir.1990), writ denied, 566 So.2d 987 (La.1990).
[18] 312 So.2d 337 (La.1975).
[19] 556 So.2d 175 (La.App.5 Cir.1990).