## NATIONAL LIFE & ACCIDENT INS. CO., Inc., v. TURNER.

### No. 16662.

Court of Appeal of Louisiana. Orleans.

May 31, 1937.

Clarence Dowling, of New Orleans, for Lillie Turner, appellant.

Porteous, Johnson & Humphrey, of New Orleans, for National Life & Accident Ins. Co.

J. N. Brittingham, of New Orleans, for A. W. Newlin, administrator.

Baldwin J. Allen, of New Orleans, for absent heirs of succession of Favero.

WESTERFIELD, Judge.

The National Life & Accident Insurance Company, Inc., which had issued a policy of life insurance to Carlo Favero, deposited the avails thereof, $434, in the registry of the civil district court and impleaded Lillie Turner, the named beneficiary, and the succession of Carlo Favero through A. W. Newlin, public administrator, rival claimants of the proceeds; the proceeding, in the nature of a concursus, being authorized by Act No. 123 of 1922.

Lillie Turner answered and claimed the proceeds of the policy as sole beneficiary, denying the right of any other person to the whole or any part thereof. A. W. Newlin, public administrator, claimed the proceeds on behalf of the succession of Carlo Favero upon the ground that Lillie Turner had killed Carlo Favero by shooting him in the back on September 12, 1936, as a result of which she forfeited any rights she may have had as his beneficiary; "it being against public policy and good morals to permit her to benefit by her wrongdoing."

The trial court originally held that Lillie Turner had killed Favero in self-defense and that because she was his concubine she could only recover one-tenth of the amount of the policy, or $43.40. Judgment was accordingly rendered in her favor for that sum, and the remainder was awarded to the other claimant, the succession of Carlo Favero. A rehearing was granted which resulted in a judgment dismissing the claim of Lillie Turner in toto and awarding the entire proceeds to the succession of Favero. From this judgment Lillie Turner has appealed to this court.

■ It appears from the testimony that Carlo Favero was the proprietor of a barroom at 1015 St. Louis street in the city of New Orleans; that Lillie Turner was his paramour and that the pair had their living quarters on the second floor above the barroom; that on the night before and the morning of the killing, Favero had been drinking heavily and was in an ugly and quarrelsome mood; that about 3 o'clock in the morning Favero went up to the bedroom occupied by himself and Lillie Turner, followed by Ethel Day, whose presence is not accounted for, and a negro porter. Ethel Day and the negro attempted to persuade Favero to retire and assisted him in removing some of his clothing. While this procedure was in progress Lillie Turner, because, according to her testimony, she believed he had quieted down, went up to the bedroom with the intention of going to bed. She brought with her a .38-caliber revolver which, during the time the barroom was open, was kept behind the counter and, according to custom, was brought upstairs when the barroom closed. She placed the revolver on a table in the hall before entering the bedroom. When she entered the room, Favero began to curse, abuse, and strike her. Lillie Turner and the porter ran from the room pursued by Favero. The porter, in his haste, slammed the door which leads onto the stairs, thus leaving Lillie Turner trapped in the hallway with the infuriated Favero rapidly approaching. In this dilemma Lillie Turner picked up the revolver, which was on the table in the hall, and as Favero neared her, fired a number shots, some of which entered his back according to the testimony of the coroner. Favero had often threatened to kill Lillie Turner, and earlier in the night she had hidden from him because of her fear of death or great bodily harm at his hands.

Without going further into the facts surrounding the killing, we believe it sufficient to say that we agree with the learned judge of the trial court in his holding both in his original judgment and upon the rehearing of the case to the effect that Lillie Turner killed Carlo Favero in self-defense. However, we are unable to agree with him in the view expressed in his reasons for judgment that it is against public policy to permit a beneficiary in an insurance policy, who had killed the assured in self-defense, to recover the proceeds of the policy. The laws of this country, and we believe of every other civilized community, justify the taking of human life in self-defense.

■ Homicide is justifiable "in the lawful defense of the slayer when there is reasonable ground to apprehend a design on the part of the person slain to commit a felony or to do some great personal injury to the slayer and there is imminent danger of such design being accomplished." Corpus Juris, vol. 30, verso Homicide, p. 43.

The right of self-defense is a natural right. In the case of State v. Rader, 94 Or. 432, 186 P. 79, 92, the Supreme Court of Oregon, in an interesting review of the history of the law of self-defense by Judge Harris, quoted the following from Sir Michael Foster:

"The right of self-defense in these cases is founded in the law of nature, and is not, nor can be, superseded by any law of society; for before civil societies were formed (one may conceive of such a state of things, though it is difficult to fix the period when civil societies were formed), I say before societies were formed for mutual defense and preservation, the right of self-defense resided in individuals; it could not reside elsewhere; and since in cases of necessity individuals incorporated into society cannot resort for protection to the law of the society, that law with great propriety and strict justice considereth them as still in that instance under the protection of the law of nature." Foster's Crown Cases, 273.

And the following from Blackstone:

" 'Self-defense, therefore, as it is justly called the primary law of nature, so it is not, neither can it be in fact, taken away

by the law of society.' 2 Cooley's Blackstone, 3 (book III, p. 4)."

Couch, in his Cyclopedia of Insurance Law, volume 2, par. 342, p. 1022, said:

"Nor is it against public policy to permit a recovery where the act was unintentional, although it amounted to involuntary manslaughter. And the same is true where the beneficiary killed the insured while acting in self-defense."

In Corpus Juris, vol. 37, p. 576, verso Life Insurance, is found the following:

"Where the assignee or beneficiary intentionally and feloniously causes the death of insured, there can be no recovery on the policy in favor of such wrongdoer or his assignee, unless the case falls within the operation of an incontestible clause. Conversely, the beneficiary is not denied recovery by reason of his act causing the death of insured where such act was unintentional or not felonious."

In Vance on Insurance, p. 599, we find:

"If, however, the death of the insured was caused under such circumstances as do not amount to felony, as when the killing was accidental or in self-defense or where the beneficiary was insane, the rights of the beneficiary are not affected."

See Holdom v. Ancient Order of United Workmen, 159 Ill. 619, 43 N.E. 772; Noller v. Ætna Life Insurance Co., 142 Kan. 35, 46 P.(2d) 22.

It is against public policy for a murderer beneficiary to recover.

"'It would be a reproach to the jurisprudence of the country, if he could recover insurance money payable on the death of a party whose life he had feloniously taken. As well might he recover insurance money upon a building that he had willfully fired.' 4 Cooley's Briefs on Law of Insurance, p. 3153; New. York Life Ins. Co. v. Davis, 96 Va. 737, 32 S.E. 475, 44 L.R.A. 305." Metropolitan Life Ins. Co. v. Shane, 98 Ark. 132, 135 S.W. 836, 839.

We are not dealing, however, with a murderer, but with one whose action in killing an assailant is justified by law.

Bouvier's Law Dictionary defines "public policy" as follows:

"That principle of law which holds that no subject can lawfully do that which has a tendency to be injurious to the public or against the public good. 4 H.L.Cas. 1."

In Corpus Juris, vol. 50, p. 858, verso Public, we read:

"In a judicial sense, public policy does not mean simply sound policy or good policy, but it means the policy of a state established for the public weal, either by law, by courts, or by general consent."

■ We find nothing inconsistent with the public policy of this state in permitting recovery upon a life insurance policy by a beneficiary who has taken the life of the assured in order to protect her own life or to avoid great bodily harm.

■ The fact that Lillie Turner was Favero's concubine does not limit her recovery to 10 per cent. of the proceeds of the policy. Article 1481 of the Revised Civil Code relative to donations has no application to the proceeds of life insurance policies, in which the paramour is named beneficiary. Morris v. Providential Life & Accident Ins. Co. et al. (La.App.) 162 So. 443.

For the reasons assigned it is therefore ordered, adjudged, and decreed that the judgment appealed from be and it is annulled, avoided, and reversed, and that there now be judgment in favor of Lillie Turner and against the succession of Carlo Favero, decreeing the said Lillie Turner to be entitled to the sum of $434 deposited in the registry of the civil district court in this proceeding, after the deduction therefrom of the court costs incurred by National Life & Accident Insurance Company, Inc.

It is further ordered, adjudged, and decreed that the claim of the succession of Favero be and it is dismissed at its cost.

It is further ordered, adjudged, and decreed that the National Life & Accident Insurance Company, Inc., be and it is hereby discharged from any further liability.

Reversed.