DREW, J.
[ i Frank Bratton was unanimously convicted of second degree murder for the killing of Ryan Hammett. The defendant was sentenced to life imprisonment at hard labor without benefits. He appeals his conviction and sentence. We affirm.
FACTS
This senseléss killing occurred on May 24, 2013, at Bossier City’s Siesta Motel, a single-story structure laid out in the shape of a “U.” Many of its guests are long-term residents. This was the case for the defendant, the victim, and the victim’s girlfriend, Jeannie Welch. Bratton and Hammett lived in rooms on opposite sides of the “U” and had become friends at the motel.
Jeannie Welch testified that:
• the relationship between the two men was quite social, and the two had never fought before the date of this event;[1]
• either the day before or the day of this incident, a woman named Veronica had moved into Bratton’s motel room;
• she and Hammett gave Veronica $20 to buy chicken;
• this she did, leaving the food with them, and returning to Bratton’s room;
• there was no argument or unpleasantness with Veronica at this point;
12* she and Hammett remained in their room and decided to eat their meal later during a basketball game on television;
• Hammett had a mixed drink; and
• shortly afterward, violence broke loose.[2]
Joel Frady, another resident, saw Brat-ton and Hammett arguing lsin the parking *940 lot. He unsuccessfully tried to get Brat-ton to disengage, but the combatants argued some more, and the melee resumed.[3]
Charles Yoder, another long-term resident of the Siesta Motel, testified that:
• he was inside his room, about to take a shower, when the fight began;
• he saw the defendant and Hammett fighting in the parking lot;
• he did not see either man actually hit the other;
• he never saw either man fall to the ground;
• when the fight ended, he heard Bratton say “I’ve got something for you” as he returned to his room;
• he saw through the defendant’s window that the defendant was rummaging through a bowl atop a radio in the room;
• he saw Bratton leave his room and walk back toward Hammett’s room;
• Veronica was begging Bratton to stop;
• he didn’t see Bratton carrying anything, although he saw that one of Bratton’s hands was “clasped” or “cupped”;
• Welch was standing in the doorway of Hammett’s room;
• he heard Bratton say “move, bitch” and then push her to the ground;
• he (Yoder) helped Ms. Welch to her feet and did not see Bratton enter Hammett’s room, but soon after saw the defendant swinging at Hammett, who was trying to escape;
14* he saw the defendant cut the victim twice;
• the disturbance inside Hammett’s room lasted two to three minutes; and
• Hammett collapsed in the doorway.[4]
After the stabbing, Bratton walked back across the parking lot to a grassy area, threw away the knife, and returned to his room.
Bossier City police officers arrived shortly thereafter and arrested Bratton.
*941 Because Bratton had a heart condition and complained of chest pains, BCPD Officer Chad Boyett transported him to University Health for examination. Bratton was explained his Miranda rights.[5] He spoke with Officer Boyett at the hospital.[6]
Officer Boyett noted no physical injuries to the defendant.
IsBCPD Officer Christopher Owens processed and photographed the crime scene. He found defendant’s distinctive baseball cap on the floor of Hammett’s room. Later, Owens found a small quantity of marijuana and rolling papers in Hammett’s pants pocket. The knife was recovered; Bratton’s DNA was found on the handle and Hammett’s DNA was found in the blood on the knife.
When Bratton was transported to the Bossier City Police headquarters, he spoke with BCPD Sgt. Darren Barclay, who also noted no injuries to the defendant. Barclay again administered Miranda warnings. Bratton admitted getting a knife from his motel room and stabbing the victim in Hammett’s room.
When Barclay realized that Bratton wanted to speak about the incident, he stopped Bratton and called in BCPD Detective Jeffrey Humphrey to take a recorded formal statement. Detective Humphrey once again read Bratton his Miranda rights. Bratton admitted going to Hammett’s room and stabbing him.
Bratton was 54 years old, 6'1" tall, and weighed approximately 220 pounds. Hammett was 34 years old, 5'7" tall, and weighed 167 pounds.
The toxicology report from the autopsy revealed the presence of Lortab, marijuana, and midazolam. Hammett’s blood alcohol level was .029%, over three times greater than the BAC level sufficient to trigger proof of a DWI.
One week after the killing, the defendant suffered a heart attack while jailed in the Bossier Parish Sheriffs Maximum Security Facility. A nurse |fiwho treated Bratton noted an eye injury that he claimed to have sustained in the fight. The injury was traumatic iritis which was consistent with trauma to the eye.
The defendant chose to testify.[7] He was convicted by a unanimous jury and received the mandatory life sentence, without benefits.
*942 The defendant did not file a motion to reconsider sentence.
^DISCUSSION
I. Sufficiency
Bratton’s first argument is that the evidence shows that he acted in self-defense or, at worst, that this offense was a manslaughter rather than second degree murder. Appellate review of such claims is well settled.[8]
Second degree murder is the killing of a human being when the offender has the *943 specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1).
La. R.S. 14:20 provides, in part:
A. A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
La. R.S. 14:21 provides:
|SA person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.
When self-defense is raised as an issue by the defendant, the state has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. Thus, when the defendant challenges the sufficiency of the evidence in such a case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. State v. Jones, 48,458 (La.App.2d Cir.11/20/13), 128 So.3d 593, writ denied, 2013-2926 (La.5/30/14), 140 So.3d 1173.
In this case, the evidence overwhelmingly demonstrates that Bratton did not act in self-defense. Regardless of the cause of the argument and fight in the parking lot, that incident had concluded with both men returning to their respective motel rooms prior to the stabbing. Indeed, the defendant was the individual who went to his room to retrieve a weapon, whereas the victim was not seen or found with a weapon and was in his own room when the killing occurred. Both Welch and Yoder heard Bratton threaten Hammett while Bratton was returning to his room to obtain the weapon. Bratton was the aggressor at the time he needlessly returned to Hammett’s room, and in his recorded statement to police, Bratton admitted that he started swinging at Hammett when he entered Hammett’s room. Despite his heart condition, Bratton, who had armed himself with a knife, was plainly |9not afraid of the much smaller Hammett because Bratton reinstated the conflict after it had terminated.
Likewise, the verdict of second degree murder rather than manslaughter was appropriate. In pertinent part, La. R.S. 14:31 defines manslaughter as a homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but- the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection, or a homicide committed without any intent to cause death or great bodily harm. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed.
“Sudden passion” and “heat of blood” are not elements of the offense of manslaughter. Instead, they are mitigatory factors in the nature of a defense which *944 exhibit a degree of culpability less than that present when the homicide is committed without them. State v. Lombard, 486 So.2d 106 (La.1986). A defendant who shows by a preponderance of the evidence that these mitigatory factors are present is entitled to the verdict of manslaughter. State v. Lombard, supra; State v. Jackson, 34,076 (La.App.2d Cir.12/6/00), 774 So.2d 1046. The defendant is not obligated to establish the factors affirmatively; instead, the jury may infer them from the overall evidence presented. State v. Jackson, supra.
| inThe evidence does not clearly reveal the genesis of this argument. In his statement to police, Bratton said that Hammett “said something stupid” to him, but he testified at trial that he was upset over something that Hammett had said to Veronica. None of this vague and conflicting evidence supplies proof that an average person would have been reasonably provoked to lethal violence.
II. Restriction on questioning a witness about her parole status
During the cross-examination of Hammett’s girlfriend, Jeannie Welch, the trial court refused to allow counsel to explore Welch’s parole status.[9]
The defendant urges that he should have been allowed to question Welch about her potential parolee status in order to probe her potential motivation for her testimony. He argues that the limitation of her testimony was error because she was the only witness to testify that Bratton cut her |1Twith the knife and the only witness to testify that he actually threatened to kill Hammett.
La. C.E. art. 609.1 provides:
A. General criminal rule. In a criminal case, every witness by testifying subjects himself to examination relative to his criminal convictions, subject to limitations set forth below.
[[Image here]]
B. Details of convictions. Ordinarily, only the fact of a conviction, the name of the offense, the date thereof, and the sentence imposed is admissible.
The defendant argues that Welch’s parole status was a part of the sentence imposed and thus admissible. Because the court itself supplied the defendant’s objection to the ruling, the actual basis for any objection the defendant had was not stated for the record. Assuming arguendo that the issue is adequately preserved for review, the trial court probably was overly restrictive in ruling that the defendant *945 could not question this witness about her parole status.
State v. Bright, 2002-2793 (La.5/25/04), 875 So.2d 37, cited by defendant, is not dispositive but it is instructive. In that case, the state withheld from the defense the rap sheet of the state’s star witness, so the defendant did not have the opportunity to cross-examine the witness’s status as a parolee. The court found reversible error, stating:
Information about a witness’s convictions is admissible and can form an important source for impeachment of such witnesses. See, LSA-C.E. art. 609.1; see generally, State v. Tolbert, 03-0330 (La.6/27/03), 849 So.2d 32. The fact that Thompson was under the supervision of the Department of Public Safety and Corrections (“DOC”) at the time of the shooting and could have been subject to parole revocation for violation of the terms of his parole (by drinking, as he admitted doing), gave him the motivation to cooperate with law-enforcement authorities, motivation defendant had a right 11{ito reveal to the jurors. See, e.g., Davis v. Alaska, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974) (Bias may arise from a witness’s vulnerable status as a probationer; the Sixth Amendment right to confrontation includes the right to cross-examine a prosecution witness concerning a possible source of bias.) The importance of such information can be heightened in a case such as defendant’s, where only one witness — the felon whose record the State suppressed — identified defendant. The only evidence relied on to convict defendant was Thompson’s testimony; there were no other witnesses, and there was absolutely no physical evidence.
Any error here was harmless beyond a reasonable doubt. The incident was witnessed by numerous people and there was no doubt that the defendant was the perpetrator of the offense. The critical questions were whether the defendant acted in self-defense or whether his conduct was less culpable than second degree murder. Ms. Welch’s statement that the defendant threatened to kill the victim was probative of the defendant’s intentions, but the testimony of Mr. Yoder also reflected the defendant’s verbal threat to harm Hammett. Moreover, the defendant’s own varied statements were sufficient to foreclose his claim of self-defense; he admitted that the conflict was over and that he, not Hammett, was the party who armed himself and chose to resume the encounter by using lethal force. This record lacks any basis for a viable manslaughter defense.
This record contains overwhelming evidence that the defendant was guilty as charged. Any arguable trial error is harmless beyond a reasonable doubt.
III. Restriction on defendant’s right to inquire about previous altercations between the victim and a witness
11sThis assignment concerns another limitation of Ms. Welch’s testimony. Ms. Welch was suffering from a broken arm at the time of this incident:
Q: Well, why didn’t you just yell to Ryan that he’s got a knife, close the door?
A: It all happened so fast. I — when I fell and got back up there was — I had no time to do anything. Frank was already in our room.
Q: Well, how did you break your arm?
A: I hit Ryan. And that was in the past. That was a conflict between me and Ryan.
Q: Okay, so you and Ryan had a physical fight that ended up with you a broken arm?
*946 A: Yes, sir.
Q: Okay. Did y’all fight often?
Prosecutor: Your Honor, I’m going to object. Your Honor, I’m going to make an objection under — make sure I have the right article.... Your Honor, I’m going to make an objection pursuant to Code of Evidence Article 404, the character of a victim. And particularly, if the victim is known for violence there has to be evidence of an overt act on the part of the victim before they can bring into any type of acts or reputation is there was violence. There hasn’t been any overt act on the part of Ryan Hammett showing that he started a fight.
Defense counsel: Well, Your Honor, would it get to self-defense and I think that the — if the defendant knows about the violent character of the accused — of the alleged victim, but his knowledge of that is admissible as well as the — the character of the victim for violence. I think it’s admissible in a self-defense case.
Prosecutor: Your Honor, that’s exactly what the article speaks to. Provided that in the absence of evidence of a hostile demonstration or overt act on the part of the victim at the time of the offense charged, evidence of his dangerous character is not admissible.
114Pefense counsel: But I would submit that a fist fight in the parking lot is an overt act.
Court: Well, I don’t really yet understand how that all got started. I — I’ve listened carefully, but I really don’t know how that started. But I think you’ve asked the question. It’s been answered. I don’t think we get to delve into their domestic relationship because I don’t think it really adds to what we’re talking about as it relates to this between this victim and the defendant. So, I’m going to note your — I’m going to sustain your objection and note your objection to my ruling.
La. C.E. art. 404 provides, in part:
A. Character evidence generally. Evidence of a person’s character or a trait of his character, such as a moral quality, is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except: (2) Character of victim, (a) Except as provided in Article 412, evidence of a pertinent trait of character, such as a moral quality, of the victim of the crime offered by an accused, or by the prosecution to rebut the character evidence; provided that in the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of his dangerous character is not admissible!.]
In State v. Johnson, 41,428 (La.App.2d Cir.9/27/06), 940 So.2d 711, writ denied, 2006-2615 (La.5/18/07), 957 So.2d 150, this court explained the relevant analysis in detail:
When a defendant attempts to present evidence of a victim’s character, it must be for a relevant purpose, such as self-defense. See La. C.E. art. 401. Thus, character evidence that paints the victim as a bad person deserving his fate of death at the hands of the defendant is prohibited by La. C.E. art. 404. State v. Wade, 33,121 (La.App.2d Cir.5/15/00), 758 So.2d 987, 996, writ denied, 2000-2160 (La.9/28/02), 797 So.2d 684. Evidence of the dangerous character of the victim is admissible only if the accused first produces evidence that at the time of the incident, the victim made a hostile demonstration or committed an overt act against the accused of such character that would have created in the mind of a reasonable person a belief that he was in immediate danger of losing life or suffering great bodily harm. See State v. *947 Scott, 31,379 (La.App.2d Cir.10/28/98), 720 So.2d 415, 424, writ denied, 1999-0170 (La.5/14/99), 741 So.2d 664 (citing State v. Gantt, 616 So.2d 1300 (La.App. 2d Cir.1993)). An “overt act” within the meaning of La. C.E. art. 404 is “any act of the victim which manifests in the mind of a reasonable person a present intention on his part to kill or do great bodily harm.” See State v. Scott, 720 So.2d at 424 (quoting State v. Demery, 28,396 (La.App.2d Cir.8/21/96), 679 So.2d 518). Before being entitled to present evidence of the victim’s character, the defendant must present “appreciable evidence” of the overt act. See State v. Woodhead, 2003-1036 (La.App. 5th Cir.1/27/04), 866 So.2d 995, 1001, writ denied, 2004-0598 (La.7/2/04), 877 So.2d 144 (citing La. C. Cr. P. art. 404; State v. Edwards, 420 So.2d 663 (La.1982)). Once the defendant has presented appreciable evidence of the overt act, “the trial court cannot exercise its discretion to infringe on the fact-determination function of the jury by disbelieving this defense testimony and thus, deny the accused a defense permitted by law.” See State v. Woodhead, 866 So.2d at 1002 (quoting State v. Lee, 331 So.2d 455, 459 (La.1975)). Thus, the threshold inquiry is whether the defendant presented evidence of “hostile demonstration or an overt act on the part of the victim.”
The trial court’s ruling here was grounded more in the relevance of the evidence than its admissibility under La. C.E. art. 404. The particular question objected to was whether the victim and the witness fought often and had nothing to do with any past troubles between the victim and the defendant. The relevance of the evidence about conflict between the victim and Ms. Welch would tend to go to the violent character of both the witness and the victim, and during cross-examination, the victim said that she broke her arm when she hit the victim. Welch’s broken arm did not tend to prove that the victim had a violent temper.
Moreover, the evidence ultimately showed that the initial violent encounter between the defendant and the victim had ended prior to the second encounter when the defendant stabbed the victim. One purpose of the article allowing evidence of a victim’s violent character, upon a showing |1fiof a hostile act, is to show that the defendant’s reaction was reasonable. Any overt act of violence by the victim occurred in the parking lot before the second encounter. All evidence proved that the defendant was the aggressor and thus not entitled to claim self-defense after he reini-tiated the conflict despite his claim at trial, repudiating his prior statements, that Hammett attacked him when he entered Hammett’s room.
IV. Excessive Sentence
The defendant argues that his life without parole sentence is excessive. The defendant concedes that mandatory sentences have been upheld as constitutional but urges that he is an exception to that rule given his age and poor health.
Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. La. R.S. 14:30.1. Where there is a constitutional mandatory sentence, there is no need for the trial court to justify, under La. C. Cr. P. art. 894.1, a sentence which it is legally required to impose. State v. Koon, 31,177 (La.App.2d Cir.2/24/99), 730 So.2d 503; State v. Rose, 606 So.2d 845 (La.App. 2d Cir.1992); State v. Gill, 40,915 (La.App.2d Cir.5/17/06), 931 So.2d 409, writ denied, 2006-1746 (La.1/26/07), 948 So.2d 165.
*948 Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant 117from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review. La. C. Cr. P. art. 881.1.
To rebut the presumption that the mandatory minimum sentence is constitutional, the defendant must clearly and convincingly show that because of unusual circumstances this defendant is a victim of the legislature’s failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. State v. Lindsey, 1999-3802 (La.10/17/00), 770 So.2d 339.
Although the defendant demonstrably has a serious heart problem, this record is devoid of a valid basis by which to justify a downward departure from the mandatory sentence. The victim had retreated from the encounter prior to the murder, and the defendant — acting under seemingly no provocation — chose to arm himself, restart the conflict and deliberately stab the unarmed victim repeatedly.
This brutal crime was senseless. The mandatory sentence is appropriate.
CONCLUSION
Even if the trial court arguably erred in restricting defendant’s cross-examination of a witness, any error was harmless beyond a reasonable doubt.
DECREE
The defendant’s conviction and sentence are AFFIRMED.

. Welch testified:
I knew him well.... We all knew each other. We were all — you know — he had friends all over the motel, you know. We all talked outside and stuff like that. We all called him Old School, is what we called him, you know. And he was even — sometimes, we'd even called him PePaw because he was just nice.... I would cook supper and if Frank didn't have anything to eat we would offer him a plate and we would carry it to him or he would come over and get a plate of whatever I cooked to eat and he would eat. We would take it back to his house and eat.... [We did this] maybe once or twice a week sometimes.

. Ms. Welch explained the next events:
It all happened so fast. He come charging over to our house because we were standing in the door and — or I was standing in the door and he come charging over to the house. I don't know if him and Ryan had words or what. I don't remember that.... Ryan was still in the house. He was right behind me because, you know, these rooms are really, really small and he had a chair that right in front of the TV, so he was right behind me.... [Mr. Bratton] made it halfway [to our room] and then I believe Ryan went out around me and they met halfway in the parking lot — or maybe not even halfway. But I never — they started swinging. He took a swing at Ryan and then, you know, you're going to defend yourself. So — I never saw any contact made, though. And I kept telling Ryan come back in the house, come back, come back. So Ryan came back to the house.
Ryan returned to their room, at which time Ms. Welch heard Bratton say, "I'm going to get my m* * *f* * * knife and I’m going to kill your ass.”
More testimony by Welch:
I said, "Oh, God.” I .told Ryan — I said, come on, please get in the house and before — I stood out, you know, right in the parking place right there. Ryan was already back in the house. And where you park at — I was standing right there and Frank was coming across the parking lot, you know, like in a stride just as fast as he could go with the knife in his hand.... He was at a fast pace walk. And when he got to where I was, I said, ‘Frank, please go home. Nobody wants any trouble. I don’t want any trouble or nothing. Please, don't do this.' And when he did that he had the knife in his hand and he got me right here *940 with the knife and told me ‘move, bitch' and threw me down. And by the time I got back up off the ground he was already in our room stabbing Ryan.
Further, in Welch's words:
When he knocked me down and I got back up I didn’t see him enter the — going in the room, but when I did get back up and turned around all I could do was stand at the door helpless, watching him stab him.... As I stood at the doorway, he was — had—he went straight in and there's a wall. And he went straight to Ryan and was stabbing like this. And I guess it got him right here. And then Ryan run around to the side — on the other side of the bed and he cornered him in the corner by the refrigerator and just repeatedly kept stabbing him. And Ryan was like this, you know, trying to get away from him. He was going “oh, oh” like that. And the only way he got away from Frank is he run across the bed and when he run across the bed I was still at the doorway. And he run across the bed and then collapsed at the end of the bed. He didn't even go back out in the parking lot at that time. I don’t know how Frank got around us and come out of the room. All I know is I looked up and after I was down on the floor with Ryan the first time and seen Frank calmly walk back to his room.

. In Frady’s words:
I went over there and Mr. Frank came out of his room and he went across the parking lot there. And there was some folks over there that met him about a third of the way before you got to the rooms. About as far from where we are here. And his girlfriend — I can’t remember her name. She got up there in his face. Mr. Frank pushed her down and went in his room — went in that other fella's room.... I was at an angle and all I could see was just a glimpse of Mr. Frank, walking past the doors. And, you know, I seen some scuffling and I don’t know who did what. But that’s all I seen. Mr. Frank went in that room and then in a few minutes — -it wasn’t very long at all Mr. Frank come back out.

. Hammett was stabbed six times, with one wound piercing his heart.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Boyett testified:
He stated that — that he and a white male subject got into an argument in the parking lot. The white male pushed — pushed him causing him to fall down. He then went into the white male subject’s room at which time that white male subject followed him with a knife in his hand. Bratton then took the knife from the white male and stabbed him. Bratton said that he is too old to fight and that he was defending himself.
The officer testified that Bratton then gave him another explanation of the event: [H]e stated that the altercation occurred when he was sitting down in a chair in front of his room. He stated that the white male subject yelled something at him. He told the white male that he wasn't going to talk to him the way he does his old lady, referring to the white male subject's girlfriend or wife. Bratton then met the subject halfway in the parking lot at which time the white male punched and pushed him. Bratton then stated during the fight he fell down. He got up and went back into his own room and got a kitchen knife. Bratton then went back to the parking lot. The white male had turned around at this time and was walking back to his room. Bratton pursued the white male and reached him at the doorstep of his room. Bratton then stabbed him several times. He stated that when he was going to his room to get the knife other bystanders were telling him, “No, Old School, don’t do it.”

. He said that prior to the fight, he talked with Veronica about going to get chicken for everyone, and he said that he told Veronica:
I told her before she left, I said, now, when you get back don’t go over there by your *942 self. I point blank told her don't go over there by yourself. But she's okay. Yeah, I know she’s okay, but he ain't okay. Don't go over there by yourself because he — no, I ain't going to say what he was doing.
He left his room and spoke with Mr. Frady, and when he came back to his room, Veronica had returned. He testified:
So, the door was open and she was sitting on the end of the bed. I thought she was talking with somebody. When I entered the room I said, who you talking to. That crazy so and so. I said, I told you not to go over there by yourself. Oh Lord, have mercy. I said, he's just arrogant. So I hollered out the door. I said, Ryan, what did you say, man? ... Ryan, what did you just say? You know, I said, I ain't never disrespected your old lady in no kind of way. I mean, why do you do this, man? So we met in the middle of the parking lot and then we eventually went to swinging.... I felt like he knew my condition and he wanted to do something- — he really wanted to hurt me. So at that point I said uh — uh, no, no, no, no, no. So I went in the room and he went back to his room.... And she was just sitting ... on the end of the bed. And I said, I’m fixing to go back over there and see, you know, see what he said to you. But I said I’m going to take this knife just in case he wants to put his hands on me again.... I was going to talk to Ryan and ask him what did you say to her. And then they say — they say I pushed — I don't remember that either, but they say I pushed Jeannie. I guess they are telling the truth. I don’t remember. Like I said, I took it just in case he put his hands on me again. I don't want to do nothing to him. I just wanted to talk to him and ask him what— what did he say to the girl. So when I got there the foot of the bed sits right — when you go in the door is the foot of the bed. And when you step up — well, you saw the pictures the other day. And there's a little dresser stand right there. As a matter of fact, right there where Ryan's shoes were— Ryan was sitting right there in the door. He was sitting down.... And I said, Ryan, don’t you ever put your hand — and when I said hand he jumped up. And when he jumped up he went to swinging. And when he went to swinging I went to swinging.... And that’s the honest to God truth. I didn't go over there to do anything to Ryan except talk to Ryan. I didn’t go over there to hurt him. I sure didn’t go over there to kill him, but when he jumped up to hit me I reacted too.... I’m not the man I used to be. I never will be anymore. I can't sit there and fight a 34 year old man.

. The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921, cert. denied; State v. Carter, 42,894 (La.App.2d Cir. 1/9/08), 974 So.2d 181, writ denied, 2008-0499 (La.11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir. 1/14/09), 1 So.3d 833, writ denied, 2009-0310 (La.11/6/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685, writ denied, 2009-0725 (La.12/11/09), 23 So.3d 396; State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 2007-1209 (La.12/14/07), 970 So.2d 529.
Where there is conflicting testimony about factual matters, the resolution of which de *943 pends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Speed, 43,786 (La.App.2d Cir. 1/14/09), 2 So.3d 582, writ denied, 2009-0372 (La.11/6/09), 21 So.3d 299; State v. Allen, 36,180 (La.App.2d Cir.9/18/02), 828 So.2d 622, writs denied, 2002-2595 (La.3/28/03), 840 So.2d 566, 2002-2997 (La.6/27/03), 847 So.2d 1255, cert. denied.

. Q: Have you ever been convicted of a crime?
A: I sure have.
Q: What?
A: I've been convicted of possession of a controlled substance, DWI, felony forgery and hot checks.
Q: Okay. Were you on parole when this happened?
Prosecutor: Your Honor, I’m going to object.'
[[Image here]]
Court: All right, you made the objection. Prosecutor: Your Honor, evidence of a criminal conviction if, she admits to it, you can’t delve into any details into it.
[[Image here]]
Defense counsel: Not trying to go into any details.
Court: Well, you asked — you asked about parole.
Defense counsel: Asked if she was on parole.
Court: I don’t think ...
Prosecutor: That’s a detail of a conviction. Court: I don’t think we have to go.into that. I think you’ve asked and it has been answered. And I think that’s where we end up. I’ll note your objection to my ruling, all right? Thank you.