Judgment rendered July 17, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 55,698-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

EMMANUEL DEWAYNE JOHNSON              Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 384,251

Honorable Christopher T. Victory, Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Holli Herrle-Castillo

EMMANUEL DEWAYNE JOHNSON              Pro Se

JAMES E. STEWART, SR.                        Counsel for Appellee
District Attorney

REBECCA A. EDWARDS
SAMUEL S. CRICHTON
CHRISTOPHER BOWMAN
Assistant District Attorneys

* * * * *

Before COX, STEPHENS, and ELLENDER, JJ.

STEPHENS, J., dissents with written reasons.

**COX, J.**

This case arises from the First Judicial District Court, Caddo Parish, Louisiana. Emmanuel Dewayne Johnson was convicted of second degree murder, in violation of La. R.S. 14:30.1, and sentenced to life imprisonment. Johnson appeals his conviction, arguing the State did not meet its burden in proving he did not act in self-defense. For the following reasons, we affirm.

## FACTS

On October 20, 2021, a grand jury indicted Johnson for the second degree murder of Patrick Lynn Goines. Johnson's jury trial began on May 10, 2023, where the following testimony and evidence were presented.

Shuntina Goines first testified that she is Goines' sister. She stated that Goines had four children and was working in hotel maintenance when he died.

Khrysten Belion then testified that she stopped for gas at a gas station off Hilry Huckaby Road in Shreveport the morning of July 21, 2021. She stated that she was texting on her phone as she went into the store to pay for her gas when she heard someone say, "I don't give a f*** about that. I ain't paying for that sh**." Ms. Belion testified that after hearing those words, she heard gunshots. She stated that the man who yelled that he was not buying something was the same man who fired the gunshots, and he was wearing baby blue clothes and a hat. Ms. Belion identified the man in the surveillance video from the gas station.

Trooper Leann Hodges ("Trooper Hodges") testified that she is currently employed by the Louisiana State Police, but at the time of the shooting, she was working as a homicide investigator for the Shreveport Police Department. Trooper Hodges stated that she arrived on the scene

after the victim was taken to the hospital. She identified diagrams made of the crime scene and the surveillance video from the gas station. The surveillance videos, including the video of the shooting, were played for the jury.

Trooper Hodges described the following from the surveillance video. Johnson arrived at the gas station as a passenger in Roy Crew's ("Crew") truck. Crew parked his truck at the gas pumps before he approached Goines' BMW, which was parked in front of the store entrance, and spoke to the occupants.[1] Johnson, wearing a blue shirt and blue pants, went into the store, came out, and had a conversation with the passenger of the BMW, Jebriel Davis, and went back into the store. Johnson again approached the passenger side of the BMW. At this point, Goines was in the driver's seat and Davis was in the passenger seat. Goines was talking through the open window to a man named Jeffery Speed ("Speed") standing outside the driver's door.

All the doors to the BMW were closed when Johnson approached. Johnson opened the passenger door and spoke with the occupants; then Goines exited the driver door with a gun in his right hand and turned his body toward Speed to his right. Johnson pulled the gun from his right pocket and shot Goines from across the vehicle twice. Goines did not raise the gun and kept it at his side. As Goines fell to the ground, his gun fell out of his hand, and Johnson ran around the front of the BMW toward Goines and shot Goines again.

---

[1] Crews was killed a few months before Johnson's trial.

During the shooting, Speed, who was standing next to Goines, ducked and ran into the store. After the shooting, Davis, the passenger of the BMW, exited the vehicle and walked into the store. Davis then left the store, entered his own vehicle, and drove away with Johnson in the passenger seat.

Video surveillance from inside the store was also played for the jury. Trooper Hodges identified Johnson inside the store and stated that he maintained eye contact with the door in the direction of Goines' vehicle, only breaking eye contact to make a purchase. While in the store, Johnson manipulated something in his right pocket and right pant leg. Johnson's hand disappeared behind his back as he exited the store. When Johnson left the store, the clerk spoke to another customer; within one minute, the clerk and customer stopped and looked out the window toward Goines' vehicle.

Trooper Hodges testified that 51 grams of marijuana and a scale were found in Goines' vehicle, which is indicative of drug distribution. She stated that Johnson came to the Shreveport Police Department the day following the shooting and was interviewed by detectives. Johnson's police interview was played for the jury. Johnson stated that Goines lifted his firearm while outside the vehicle and pointed it at him. He stated that he and Goines were on good terms, and he hated "the way everything went." He stated that he previously had an altercation with Goines about a woman, in which Goines pulled a gun on him, and he left. Johnson surrendered his .22 caliber Glock pistol to investigators.

Johnson told police that he thought Goines got a shot off during the exchange outside the store. Trooper Hodges stated that Goines had a 9 mm handgun and Johnson had a .22; the only shell casings found at the scene were from a .22.

3

Kimberly Skyles testified that she is a victim coordinator for the Caddo Parish District Attorney's Office. She stated that she was involved in communicating with Speed to be a witness at this trial. She testified that Speed was uncooperative, arrived the first day of court, returned the morning of the second day, left the afternoon of the second day, and did not return to court. Speed did not testify at trial.

Michael Stelly ("Stelly") testified that he works for the North Louisiana Crime Lab. Stelly was accepted as an expert in forensic firearm analysis. Stelly described how a fired gun leaves marks on the cartridge and bullets that are shot. He stated that he uses microscopes to compare the markings on ejected cartridges and bullets recovered at a crime scene to those shot in a lab to determine if they were fired from the same weapon. Stelly testified that he analyzed the cartridges from the crime scene, and they matched the markings from the .22 caliber Glock pistol he received from investigators. Stelly stated that the bullets he was given did not contain sufficient individual markings to make a positive identification of the exact gun from which they were fired. He testified that he was certain that three of the four bullets had the same characteristics as bullets being fired from a .22 caliber Glock pistol; and the fourth bullet had similar characteristics but was severely damaged.

On cross-examination, Stelly testified that he did not fire the 9 mm Glock pistol that was found at the crime scene. He stated that by just looking at the 9 mm from across a room, it is not possible to tell whether it is loaded.

Dr. Long Jin ("Dr. Jin") was accepted as an expert in forensic pathology. He testified that he performed the autopsy on Goines. Dr. Jin

4

stated that Goines' cause of death was multiple gunshot wounds. He testified that Goines had four penetrating gunshot wounds: back left side of head; top of left shoulder; left anterior shoulder; and left chest. Dr. Jin noted that he found all four bullets in Goines' body while performing the autopsy. He stated that bullets passed through Goines' heart, aorta, lung, and brain. Dr. Jin testified that the gunshot wound to Goines' left chest occurred while Goines was lying on the ground and was a fatal shot. However, he stated that he was unable to determine the order in which the gunshot wounds occurred.

On cross-examination, Dr. Jin testified that the shot to the back of Goines' head stuck his brain, which would cause a victim to collapse. He stated that sort of shot to the head is fatal. He testified that the shot to Goines' left anterior shoulder also punctured Goines' lung, which would have been a fatal shot. Dr. Jin stated that the shot to Goines' left chest is the only one he knows for sure happened while Goines was lying on the ground; he could not say whether the other three shots occurred while Goines was standing. Dr. Jin testified that Goines' toxicology report showed positive for methamphetamine and marijuana.

The jury unanimously found Johnson guilty as charged of second degree murder. Johnson filed a motion for post-verdict judgment of acquittal, arguing that the State failed to prove that he was not acting in self-defense, and the evidence against him was insufficient to convict him of second degree murder. The trial court denied the motion in open court. Johnson waived his sentencing delays and the sentencing hearing commenced.

The trial court considered the factors listed in La. Cr. C. art. 894.1. The trial court found that Johnson needs corrective treatment, and a lesser sentence would deprecate the seriousness of the offense. In considering the aggravating and mitigating factors, the trial court found the following facts to be aggravating factors: Johnson used a firearm in the commission of second degree murder; he fired a gun at a public gas station, endangering the lives of others; and the victim died as a result of his injuries. The trial court did not find any mitigating factors to apply. The trial court sentenced Johnson to the mandatory sentence of life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence.

Johnson filed a motion to reconsider sentence, arguing that his life sentence was excessive, and the trial court has discretion to reduce the mandatory minimum sentence when the sentence would be constitutionally excessive. He argued that his sentence is excessive given that "it was carried out after Patrick Goines had pulled a gun and acted aggressively towards Emmanuel Johnson." The trial court denied Johnson's motion to reconsider sentence on June 11, 2013. Johnson now appeals.

## DISCUSSION

In his sole assignment of error, Johnson argues that the evidence was insufficient to uphold a conviction for second degree murder because the State failed to prove the homicide was not committed in self-defense.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the case in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658

6

(La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004); *State v. Mathis*, 52,500 (La. App. 2 Cir. 1/16/19), 263 So. 3d 613. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *Mathis, supra*.

The appellate court does not assess the credibility of witnesses or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442; *State v. Steines,* 51,698 (La. App. 2 Cir. 11/15/17), 245 So. 3d 224, *writ denied*, 17-2174 (La. 10/8/18), 253 So. 3d 797. A reviewing court affords great deference to a trial court's decision to accept or reject the testimony of a witness in whole or in part. *Mathis, supra*; *Steines, supra*.

The *Jackson* standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of the evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is viewed, the facts established by the direct evidence and inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. *State v. Sutton*, 436 So. 2d 471 (La. 1983); *Steines, supra*.

Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. *State v. Mingo*, 51,647 (La. App. 2 Cir. 9/27/17), 244 So. 3d 629, *writ denied*, 17-1894 (La. 6/1/18), 243 So. 3d 1064. The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must

exclude every reasonable hypothesis of innocence. La. R.S. 15:438. The appellate court reviews the evidence in the light most favorable to the prosecution and determines whether an alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. *State v. Calloway*, 07-2306 (La. 1/21/09), 1 So. 3d 417; *Mathis, supra*; *State v. Garner*, 45,474 (La. App. 2 Cir. 8/18/10), 47 So. 3d 584, 587, *writ not cons.*, 12-0062 (La. 4/20/12), 85 So. 3d 1256.

Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1).

Applying the *Jackson* standard to the evidence established in this case, we find that a rational trier of fact could have found that the State carried its burden of proving beyond a reasonable doubt that Johnson acted with specific intent to kill or inflict great bodily harm upon Goines. Johnson does not deny that he killed Goines; instead, he claims that his actions were justified because he acted in self-defense based on his belief that Goines was armed with a firearm when he exited his vehicle. On appeal, Johnson asserts that the State failed to prove beyond a reasonable doubt that the homicide was not committed in self-defense.

A homicide is justified when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. La. R.S. 14:20(A)(1). When self-defense is raised as an issue by the defendant, the State has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. *State v. Bratton*, 49,434 (La. App. 2 Cir. 1/14/15), 161 So. 3d 937, *writ*

8

*denied*, 15-0303 (La. 11/20/15), 180 So. 3d 317. When the defendant challenges the sufficiency of the evidence in such a case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. *Id.*

In this case, the evidence supports the jury's unanimous conclusion that Johnson did not act in self-defense. Although he did not testify, Johnson gave a statement to police the day after the shooting. Johnson told detectives that Goines got mad, pulled his weapon out inside the vehicle, exited his vehicle, and "came up with" the gun. Johnson stated that he thought Goines was going to shoot him and he was scared so he shot him. He also stated that he and Goines were on good terms, although they had a prior incident over a woman where Goines pulled his gun on Johnson and Johnson left the situation.

However, the surveillance video contradicts Johnson's version of events. The video shows Johnson approach Goines' vehicle on the passenger side, have a 1 ½ minute conversation with the occupants, smile during the conversation, and then enter the store; Johnson approached the passenger side door again after leaving the store. When he approached after leaving the store, he was heard by Ms. Belion shouting that he was not buying "that sh**." Goines exited his vehicle on the driver's side and turned slightly right, toward the back seat of his vehicle talking to Speed. Goines can be seen with a gun in his right hand. Although he did turn his head toward Johnson, he never turned his body toward Johnson nor did he raise his gun. Goines' right arm stayed straight down by his side with his right index finger on the slide of the gun.

9

While Goines was still turned toward his right, Johnson began shooting Goines. Johnson fired his gun, ran around the vehicle to Goines' side of the vehicle, and continued to shoot. Goines began falling to the ground before Johnson ran to Goines' side of the vehicle. Goines dropped his gun when he fell. Johnson fired four total shots at Goines. Three of the shots would have been fatal shots and at least one was fired while Goines was lying defenseless on the ground. Goines never lifted his arm to return fire and all the shots are on Goines' left side of his body as he turns away from the shooting. The shot to Goines' head entered on the back, left side, which reinforces that he was turned away from Johnson.

The State also highlighted the surveillance video inside the store, where Johnson was seen watching Goines' vehicle and fumbling with something in his right pocket, the same side from which he pulled his gun. In addition, Johnson managed to shoot only Goines, missing Speed, who was standing right beside Goines.

Based on the surveillance video and Johnson's statement, which was contradicted by the video, a reasonable jury could find that the State proved the shooting was not in self-defense. Other than declining to purchase what Goines' was selling, the exchanges between the men appeared to be amicable. Johnson stated that Goines raised his weapon first, which did not happen. Based on the videos, autopsy report, and Johnson's contradicted statement to police, the jury reasonably found that Johnson was not acting in self-defense. We give great deference to the jury's finding of fact and will not substitute our own appreciation of the evidence for that of the jury. For these reasons, we affirm Johnson's conviction for second degree murder.

10

## CONCLUSION

For the reasons expressed above, we affirm Johnson's conviction for second degree murder.

**AFFIRMED.**

**STEPHENS, J., dissenting.**

I respectfully dissent from the majority's opinion. The United States Supreme Court, in *District of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008), held, *inter alia*, that the Second Amendment to the United States Constitution conferred an individual right to keep and bear arms. The Supreme Court in *Heller* further recognized that the Second Amendment guarantees the individual the right to possess and carry weapons in case of confrontation, a meaning strongly **confirmed**, not granted, by interpretation and analysis of the historical background of the Second Amendment. *Id.*, 554 U.S. at 592, 128 S. Ct. at 2797 (2008). "It has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right. The very test of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it 'shall not be infringed.'" *Id.*[2] This state likewise gives credence to the theory that self-defense is not a creation of government, but an inherent right. In its analysis leading to its holding, which was that an insured beneficiary could collect proceeds on the policy of a person whose life she took "in order to protect her own life or avoid great bodily harm," a Louisiana appellate court in *National Life & Accident Ins. Co. v. Turner*, 174 So. 646 (La. App. Orl. 1946), acknowledged that the right of self-defense is a natural right. *Id.* at 647.

My two esteemed colleagues have, in affirming the defendant's conviction for second degree murder, emphasized the minutia of the

---

[2] The Supreme Court expressly noted that it did not read the Second Amendment as protecting the right, *inter alia*, of citizens to carry arms for *any sort of confrontation*. *Id.*, 554 U.S. at 595, 128 S. Ct. at 2799.

1

shooting, particularly the number of shots fired by the defendant and the fact that he fired at the victim after he had fallen, to find that the State met its burden of proving that the homicide was not committed in self-defense. The problem with this analysis is that is impermissibly grafts onto the statutory requirements of justifiable homicide an additional inquiry not present in homicide cases, but one which is **mandatory in non-homicide cases**—whether the force used was reasonable under the circumstances. *See*, *State v. Freeman*, 427 So. 2d 1161, 1162 (La. 1983), wherein the Supreme Court observed that different statutory standards exist to justify the use of force or violence under La. R.S. 14:19 and R.S. 14:20 depending upon whether a homicide results.[3]

The video footage clearly shows the events immediately surrounding the shooting, as well as the shooting itself. The video time counter shows that **everything took place within a span of two minutes**—from Johnson's approach to the white BMW until he and Davis pulled out of the gas station parking lot in the red Trailblazer onto North Hearne Avenue.[4] In fact, **the**

---

[3] La. R.S. 14:20(A)(1) provides that **a homicide is justifiable** when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm **and that the killing is necessary to save himself from that danger**. On the other hand, **in non-homicide cases**, La. R.S. 14:19(A)(1(a) provides that the use of force or violence upon the person of another is justifiable … when committed for the purpose of preventing a forcible offense against the person, provided that **the force or violence used must be reasonable and necessary** to prevent such offense. (emphasis added).

[4] 10:46:04      Johnson is at the passenger's side door of the white BMW.
     10:46:09      Goines moves around in the car, apparently having words with Johnson. Goines pushes his driver's side door open, with his left hand on the steering wheel, and begins rotating his body to exit his vehicle. Johnson has begun to stand up and push away from the vehicle (apparently having seen the .9 mm Glock in Goines' hand).
     10:46:13      Johnson takes a step back from the white BMW and his right hand starts going towards his pocket.
     ***10:46:14***      ***Johnson begins firing at Goines.***
     ***10:46:16***      ***Goines falls to the ground after the first three shots. Johnson***

*shooting itself took only two seconds*. It is unreasonable to hold a person who must make an instantaneous life-or-death decision to the same standard as a judge or jury who, after the fact, has unlimited time within which to consider the facts and circumstances and pass judgment.

From a more pragmatic standpoint, any shots fired after Johnson ran around the vehicle were superfluous, Goines having already met his demise. As Dr. Jin told the jury, the first three shots entered Goines' body while he was standing. Dr. Jin also described shots one and three as lethal or "kill" shots. There was *no testimony* to contradict this evidence. Detached reflection cannot be demanded in the presence of an uplifted knife. *Brown v. United States*, 256 U.S. 335, 343, 41 S. Ct. 501, 502, 65 L. Ed. 961 (1921). A last shot, which is intentional and unnecessary when considered in cold blood will not necessarily cause a defendant to lose his immunity if it followed close upon others fired in the heat of conflict if the defendant believed [he] was frightened for [his] life. *Id.*, 256 U.S. at 344, 41 S. Ct. at 502 (1921). The prosecution had the burden of proving beyond a reasonable doubt that Johnson did not kill Goines in self-defense. In this case, the State fell woefully short of doing so. For this reason, I dissent.

---

*does not stop, but keeps on going, running around the white car. As he does so, Johnson fires another shot in Goines' direction.*

| | |
|---|---|
| 10:46:22 | Johnson reaches Crew's Tahoe. |
| 10:46:31 | Johnson walks to Discount Tire before going back to Crew's vehicle. |
| 10:47:04 | Johnson is denied entry to Crew's vehicle a second time. |
| 10:47:35 | Johnson approaches the red Trailblazer. Davis is inside, with the doors locked. |
| 10:47:49 | Davis lets Johnson into the Trailblazer. |
| 10:48:09 | Davis and Johnson, in the red Trailblazer, exit the gas station parking lot onto North Hearne Avenue. |